# NOTIFICATION OF PERSONNEL ACTION

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| Ridgely Jr,Michel A | | 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 | 08-08-1951 | 01-31-1999 |

**FIRST ACTION** | **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 721 | Reassignment | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| CNV | Conversion | | |
| | Conversion | 6-E. Code | 6-F. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | SUPPLY MANAGEMENT OFFICER |
| | Job Code (PD):  002309 |

| 8.Pay Plan | 9.Occ. Code | 10.Grade or Lvl | 11.Step or Rate | 12.Total Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. Code | 18.Grade or Lvl | 19.Step or Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 2003 | 11 | 05 | $46,142.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $42,776.00 | $3,366.00 | $46,142.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | Mine Safety and Health Administration |
| | OFC OF DIRECTOR OF ADMIN & MGMT |
| | DIVISION OF MANAGEMENT SERVICES |
| | MSHA,A&M, FACIL,& PROPERTY,MGT.BR. |
| | FACILITIES & PROP MGMT GROUP-ARL |

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1-None 3-10 Point/Disability 5-10 Point/Other 2-5 Point 4-10 Point/Compensable 6-10 Point/Compensable/30% | 1 | 0-None 2-Conditional 1-Permanent 3-Indefinite | | YES  X  NO |
| 27. FEGLI | | 28. Annuitant Indicator | | 29. Pay Rate Determinant |
| CO | Basic Only | 9 | Not Applicable | 0 |
| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
| 1 | CSRS | 08-25-1971 | F | Full Time | |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1 | 1-Competitive Service 3-SES General 2-Excepted Service 4-SES Career Reserved | E | E-Exempt N-Nonexempt  R056Q3AG000001101000 | 8888 |
| 38. Duty Station Code | | 39. Duty Station (City-County-State or Overseas Location) | | |
| 510100013 | | ARLINGTON Arlington VA USA | | |

| 40. Agency Data | 41. | 42. | 43. | 44. PAR Number: |
|---|---|---|---|---|
| | | | | |

45. Remarks

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| U.S. Department of Labor | |
| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | Joseph H Stormer |
| DLMS | 4155 | 06-10-1999 | HUMAN RESOURCES OFFICER |

Editions Prior to 7/91 Are Not Usable After 6/30/93

4 Utility Copy

**1.1**

**POSITION DESCRIPTION** *(ee Read Instructions on the Back)*

ncy Position No. ’99049

b. OPM Certification No.

| 2. Reason for Submission | 3. ... rvice | 4. Employing Office Location | 5. Duty Station |
|---|---|---|---|
| ☐ Redescription  ☒ New | ☒ Hdqtrs.  ☐ Field | Arlington, VA | Arlington, VA |
| ☐ Reestablishment  ☐ Other | | | |

7. Fair Labor Standards Act
☒ Exempt   ☐ Nonexempt

8. Financial Statements Required
☐ Executive Personnel Financial Disclosure   ☐ Employment and Financial Interests

9. Subject to IA Action
☐ Yes   ☒ No

13. Competitive Level Code

**·planation** *(Show any positions replaced)*

10. Position Status
☒ Competitive
☐ Excepted *(Specify in Remarks)*
☐ SES (Gen.)   ☐ SES (CR)

11. Position Is:
☒ Supervisory
☐ Managerial
☐ Neither

12. Sensitivity
☐ 1—Non-Sensitive   ☐ 3—Critical Sensitive
☒ 2—Noncritical Sensitive   ☐ 4—Special Sensitive

14. Agency Use
8888

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | *Supply Management Officer* | GS | 2003 | 11 | ... | 1/29/99 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

16. Organizational Title of Position *(if different from official title)*

17. Name of Employee *(if vacant, specify)*

18. Department, Agency, or Establishment
U.S. Department of Labor

a. First Subdivision
Mine Safety and Health Administration

b. Second Subdivision
Directorate of Administration & Mgmt.

c. Third Subdivision
Division of Management Services

d. Fourth Subdivision
Branch of Facilities and Property Management

e. Fifth Subdivision

Signature of Employee *(optional)*

19. Employee Review—This is an accurate description of the major duties and responsibilites of my position.

Supervisory Certification. *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the*

knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor
Melissa Stoehr
Chief, Branch of Facilities and Property Mgmt.

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*
Richard B. Rose
Chief, Division of Management Services

Signature *(Melissa Stoehr)*   Date 1/20/99

Signature   Date 1/20/99

21. Classification/Job Grading Certification. *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

22. Position Classification Standards Used in Classifying/Grading Position
OPM PCS GS-2003, HRCD-5, June 1898
OPM Grade Evaluation Guide for Supply Positions, HRCD-5, June 1898

Typed Name and Title of Official Taking Action
DAVID K MANN
Personnel Management Specialist

Signature *(David K Mann)*   Date 1/29/99

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks
PL GS-11

Major Duties and Responsibilities *(See Attached)*



Supply Management Officer
GS-2003-11

## A.   INTRODUCTION

This position is located in the Branch of Facilities and Property Management, Management Services Division, Directorate of Administration and Management, Mine Safety and Health Administration (MSHA).

The incumbent serves as the manager of Arlington Operations. Incumbent is responsible for support to the following areas:

> Office of the Assistant Secretary, Deputy Assistant Secretary and support staff
> Office of Congressional and Legislative Affairs
> Office of Information and Public Affairs
> Directorate of Administration and Management
> Coal Mine Safety and Health
> Metal and Nonmetal Mine Safety and Health
> Directorate of Technical Support
> Office of Assessments
> Office of Standards, Regulations, and Variances

## B.   MAJOR DUTIES

1. Serves as the manager of Arlington Operations with full responsibility for the planning, directing and supervision over all of the services that Arlington Operations provides. Applies a thorough knowledge of policies, regulations, and procedures pertinent to the varied functions performed by the Arlington Operations staff.  Work performed requires sound management ability to plan, direct, and evaluate program operations and related activities.

2. Serves as Accountable Property Officer for the Directorate of Administration and Management and responsible for Arlington property management program.  Responsibility for property management includes the following:
   a.   Establishes and maintains adequate property accounting records and safeguards to insure effective control over all Arlington accountable property.  Responsible for liasion between all MSHA Headquarters Accountable Property Officers relfected above and the Denver Operations and Beckley offices for inventory control and inventory reconciliation with the Capitalized Assets Tracking and Accountability Recording system.



b. Responsible for the maintenance, review, and adjustment of all Arlington property records, including maintenance of proper documentation to support inventory adjustments.

c. Directing the establishment and proper maintenance of adequate property accounting records and safeguards to insure effective control over all property. Instructs personnel in the operation of the automated property system encompassing coding of property, property descriptions, ownership markings, use of computer listings for purposes of control, utilization of property, inventory control, and processing of changes to update the information and control system.

d. Establishes and directs a system for the acquisition and disposal of excess property. Maintains a control system for the disposal of property. Controls all items during disposal processing and maintains proper documentation regarding the property disposal. Reviews and distributes listings of available excess property based on needs, knowledge of equipment type and condition of equipment. Reviews purchase requests to determine if requested item and be obtained from internal or external sources of available excess property and obtains excess property to meet Arlington office needs. Responsible for the operation of the excess property storage/warehouse area. Responsible for office moves and storage and disposal of office furniture.

3. Acts as the Contracting Officers Representative on facilities and property management contracts, such as, guard service contracts, custodial contracts, contract driver contracts, etc. This involves research of existing contract, soliciting input from appropriate officials, attending meetings with successful bidders and rendering advice and guidance as to MSHA requirements. Monitors contractor performance throughout the contract life.

4. Responsible for the management of the Arlington supply management program. Authorizes supply issues and supply acquisitions for replenishment of stock. This involves determining present and future supply requirements and allowances. Stocks equipment, supplies and spare parts for highly sophisticated equipment, such as, computer, high speed and laser printers, fax equipment, graphics

**1.4**



productions, etc. requiring highly specialized knowledge of the various types of equipment, it's operation, current needs, future needs, and source vendors of supply and maintenance. Inspects items, reviews use data, and dtermines which items can be economically repaired and returned to stock, arranges for repair and restocking of equipment. Directs the receiving and shipping functions and prepares documentation relating to these functions.

5.  Responsible for the management of MSHA Arlington office leased space. Inspects buildings and grounds for condition and space availablility and suitability for MSHA requirements. Reviews space assignments and requests and prepares recommendations on the utilization of space, office relocations, reassignments of space and space utilization. Makes recommendations regarding conslidation of organizational units and maintains space inventory and space assignment records. Prepares space layouts and prepares current and future cost projections. Coordinates acquisitions, changes, alterations, improvements, complaints, and other space matters with the General Services Administration (GSA). Responsible for analyzing requirements of office or unit relocations in relation to physical moves. Projects labor force requirements, acquires labor force from DOL, directs the labor force and activity during relocations.

6.  Responsible for the review and design of the Arlington telecommunications system and telecommuncations systems throughout the Eastern MSHA offices to obtain the best possible service and utilization while maintaining it's cost effectiveness. Reviews requests or initiates requests for service with telephone company or other responsible organizations. Monitors the payment of telecommunication invoices and facilitates resolution of problems. Directs and coordinates the training of personnel in the programming and operation of the Headquarters telecommuncations system.

7.  Responsible for management of the vehicle program for MSHA offices throughout the Eastern United States.

8.  Incumbent is responsible for the establishment and performance of a wide variety of general services for the MSHA Headquarters office. Examples of these services are: special projects and requests from the Assistant Secretary's office, arranging conference facilities for upper level management and technical personnel,providing metro transit



cards for transportation into the District of Columbia, providing specialized communications, building maintenance and repair. In this wide area of responsibility, incumbent has the authority to establish regulations, methods and procedures which will control the utilization of such services.

9. Incumbent serves as the coordinator for the Chief, Facilities and Property Management Branch on all matters within the areas of facilities and property management. This involves such duties as representing MSHA at outside meetings with DOL, GSA, DOD, etc.

10. Responsible for the MSHA Headquarters security program. Directs the establishment and maintenance of building security to insure the maximum security possible for building occupants within budget restraints.

11. The incumbent designs MSHA forms (nationwide) and develops specifications for the reproduction and printing of all types of MSHA forms and designs MSHA forms when needed. Conducts fact finding surveys and prepares detailed analyses of data gathered from surveys. Evaluates the agency's need for the form and how it relates to the mission and function of MSHA. Designs and reproduces forms both electronically (using computer software) and through traditional drawing techniques. The incumbent ensures that the final design is in conformance with standards established by the Office of Management and Budget (OMB), General Services Administration (GSA), Government Printing Office (GPO), the U.S. Postal Service (USPS), as well as established DOL policies, making contacts, as necessary, both inside and outside DOL.

12. The incumbent develops specifications for printing of publications and other materials ordered from the MSHA Academy print shop, the DOL Printing Plant and the U.S. Government Printing Office (GPO). Items for printing include forms, periodicals, reports, signs, decals, pamphlets, folders, covers, illustrations, and postal service (mail) items. Printing and binding requisitions received from program offices are reviewed for completeness and accuracy. As necessary, prepares detailed specifications (i.e., method of composition, type of printing, paper stock, color of ink, binding, finishing,etc.) For the printing of manuals, brochures, reports, charts, forms, posters, tags, labels, microfilm and multi-color products. When possible, suggests new methods

and processes to save time and money for old or new products. As the inter-agency coordination of MSHA printing needs, works with printing specialists at the DOL and/or one of the GPO locations, as necessary, to resolve technical cost, and scheduling problems relating to those needs. Ensures that printing is ordered from the appropriate source to prevent the agency from violating the Joint Committee on Printing (JCP) regulations regarding the number of impressions made for a single document by an individual source. The incumbent must deal effectively with a wide range of individuals at all levels.

13. The incumbent is responsible for planning, schedules, and conducting on-site surveys of the utilization of photocopy, facsimile, microfilm and other similar technologies for MSHA offices with varying administrative support needs. The incumbent evaluates needs and deficiencies of the organization and determines the type of equipment which will be most beneficial to the effective operation of the organization. The incumbent is responsible for lease vs. purchase analysis, maintenance cost analysis, life cycle analysis, and utilization analysis and recommends to higher-level MSHA management the most feasible technology to acquire, based on a determination that the technology recommended is the most cost-effective, efficient, and otherwise adequate to meet the needs of the requesting office.

14. Responsible for compliance reviews of above activities which encompass comprehensive audits of the various Arlington Operations functional areas. Instructs personnel in the correction of deficiencies observed and assists them in the interpretation of regulations as applied to situations. Initiates corrective action and monitors results and improvements through completion.

15. The incumbent makes recommendations to resolve a wide range of other administrative problems/issues that affect the day-to-day activities of the Arlington Operations. Develops procedural manuals and provides guidance (both oral and in writing) on techniques for management and methods improvement.

16. As a supervisor, incumbent is responsible for being knowledgable about management's role and responsibilties in labor management relations. When a local agreement is in effect, incumbent is responsible for becoming completely

 

familiar with the terms of the agreement and coordinating issues through the MSHA Arlington Human Resource Division when appropriate.

17. As a supervisor, incumbent is responsible for the on-the-job safety and health of all employees under his/her jurisdiction. Initiates efforts conforming to established MSHA safety programs to satisfy this responsibility. Requirements include identifying and correcting job safety and health hazards, instructing employees on safety requirements for job assignments, reviewing and reporting loss incidents, in accordance with MSHA and SWCP regulations, initiating corrective measures for violations of OSHA standards, and directing periodic inspections of the Arlington Operations office workplace.

18. As a supervisor, incumbent is responsible for insuring equal opportunity for all employees under his/her supervision in the selection of employees for training, promotions, awards and recognition, and other career development opportunities. The incumbent will also insure fair and unprejudiced employment practices in the recruitment and selection of candidates for appointments to positions under his/her supversion. The incumbent is responsible for supporting programs related to the training and advancement of employees and for actively supporting the Equal Opportunity Program in day-to-day activities.

B. **FACTORS:**

1. Knowledge Required for the Position:

Initiative, sound judgement, and a thorough understanding of the MSHA organization must be emloyed in the application of all rules and regulations applying to the work. Thorough working knowledge of property management operations, the applicable Federal Regulations, DOL Policies, OMB, GSA, USPS, GPO, JCP, and applicable rules, decisions and policies. Ability to carry out the regulations with respect to property management. Ability to coordinate the Arlington Operations and systems and cooperate with all other functions of the agency. A high degree of specialized knowledge of markets and sources of supply. Knowledge of printing processes to the extent of providing clear instructions to the printer (i.e., specifications regarding ink, paper, binding, typography, etc.). Knowledge of qualitative and quantitative techniques for analyzing and

 

measuring effectiveness, efficiency and productivity of administrative and technical programs. A comprehensive knowledge of management and organizational techniques, systems and procedures, for application in performing analytical studies, reviews and surveys. Knowledge of the theories, principles, practices, an techniques of management including administrative practices and procedures.

2.  Supervisory Controls

General direction is provided by the Chief, Branch of Facilities and Property Management. The incumbent is assigned work in terms of project objectives and basic priorities. The incumbent independently plans and carries out the projects, selecting the approaches and methods to be used in solving problems. Controverial issues are resolved in consultation with the supervisor. Projects are reviewed to determine that the objectives are met and for compliance with regulations and agency policy.

3.  Guidelines

While minimal guidelines exist, those that do exist consist of established Federal regulations, OMB, DOL, GPO, JCP, USPS, and MSHA established policies and procedures. Incumbent relies on knowledge and experience to operate within the scope of regulations when available guidelines are not specific or do not cover all aspects of a problem or questionable area. Reference materials are generally broad in nature; therefore, the incumbent must exercise a wide degree of indepedent judgement, interpretation, and discretion.

4.  Complexity

The incumbent evaluates the Arlington Operations functions and based on these findings concludes what action is appropriate. The position requires a knowledge of a wide variety of operations. The objective is to obtain or render services, equipment and forms management to fulfill the program objectives of MSHA and to provide for the effective and efficient functioning of the agency.

5.  Scope and Effect

Arlington Operations services are performed for all organizational units in Arlington Headquarters. These

 

services are of prime importance to the functions serviced and can either expedite or retard activities depending on the degree of the incumbent's performance. The incumbent's responsibilities have a direct impact on the effective management of the functions and the entire MSHA Headquarters. Effects inter-agency coordination and ensures prompt processing, printing, and distribution of forms and other publications for agency effectiveness. Performs design and lay-out of all MSHA forms to reduce agency production costs. Incumbent is responsible for directing the Eastern Regional vehicle and telecommunication programs. Poor judgement or misapplied information can cause embarrassment and prove detrimental to the efficiency of MSHA. Therefore, this position is considered to be a highly responsible function with considerable latitude for independent judgement and direction.

6.   Personal Contacts

The incumbent has daily contact with individuals at all levels within MSHA. Periodically meets with DOL, GSA and GPO staff at various levels and marketing representatives of commercial firms.

7.   Purpose of Contacts

The incumbent meets with MSHA personnel to review and discuss requirements and to resolve problems associated therewith. Meets with MSHA, DOL, GSA and GPO staff to discuss issues related to all functional areas of the Arlington Operations. The incumbent will sometimes be required to deal in a hostile environment when conducting discussions to rectify situations, protect the interests of MSHA, and to obtain information in order to provide efficient and timely service.

8.   Physical Demands

The work is mostly sedentary; although, there is some walking and bending required.

9.   Work Environment

The job is perfomed both in an office environment or in a warehouse, storeroom, or moving activity where strong leadership may be required.



Ridgely Michel A. J

| | |
|---|---|
| From: | Ridgely Michel A. Jr. |
| Sent: | Thursday, March 09, 2000 12:09 PM |
| o: | Stoehr Melissa |
| Subject: | RE: |
| | |
| Sensitivity: | Personal |

Melissa,

I appreciate your informative response.  However, I do have some personal concerns that I would like to discuss in private prior to the new staff members coming on board.  May we meet?

Thanks!
Michel

———Original Message———
From:    Stoehr Melissa
Sent:    Wednesday, March 08, 2000 3:17 PM
To:    Ridgely Michel A. Jr.
Subject:    RE:
Sensitivity:    Personal

Hello Mike,

Keith Pendergast will move to the 7th floor in the area with Patti on or before Friday 3/10.  As you know, Keith is a Program Analyst that reports to the Chief, Division of Management Services.

Charles Brinkley will begin working in the Branch of Facilities and Property Management on Monday 3/17/00 and will sit where Keith is currently located.  As we previously discussed, Charles will be responsible for the National Security Program and also oversight and management of the Arlington Operations work.

Mr. John Nixon was selected as the Chief, Branch of Facilities and Property Management and accepted the position yesterday.  HRD is trying to arrange his starting date with MSHA on Monday 3/27/00.  Mr. Nixon will be sitting in my old office on the first floor.

Kathy Apodaca was selected as the National Space Manager to replace Norton Canterbury who retired.  Kathy is working out of the FPMB office at Denver and will report for duty at Arlington on Monday 3/27/00.

Once the new employees are on board, I will be meeting with them to discuss the organizational issues, work assignments, goals and initiatives. We will also be discussing staffing and future plans. I will be asking Mr. Nixon to evaluate the F&PMB organization and give me his recommendations for improvement.  I will be asking Mr. Nixon to meet with all Branch employees to discuss the work and any other issues that employees want to discuss. I feel that it would be premature for us to meet at this time.

Melissa

———Original Message———
From:    Ridgely Michel A. Jr.
Sent:    Wednesday, March 08, 2000 1:02 PM
To:    Stoehr Melissa
Subject:    
Importance:    High
Sensitivity:    Personal

Melissa,

I am somewhat in the dark about the changes taking place beginning next week.  I would appreciate meeting with you for a few minutes to satisfy my curiosity and to address some of my concerns.  I would like to meet with you privately prior to the new staff members coming on board.  Please let me know if this is possible.  If so, please set a day and time that will be convenient.

Monday June 5, 2000

Approximately 4:30 p.m.

Nick's Office.

I went in to complain to Nick about Charles' conduct when I was trying (about 4:15 p.m.) to help Bob Cohn regarding an audio-visual request. During the conversation with Nick, Nick informed me that he was in the process of rewriting my position description. He said the supervisory responsibilities would be taken from my P.D. and placed into Charles' to justify Charles' GS-13. When I asked if a promotion was possible, Nick's response was that he was having a difficult time justifying my GS-11. In addition, Nick told me he was in the process of hiring a GS-12 Property Officer. There was no mention of an opportunity being given to me for the Property Officer's job. In fact what was said was he needed someone with specialized experience for that position. It should be noted that Nick had mentioned to Rudy earlier that Charles would soon be the supervisor and that I would no longer be supervisor.



**U.S. Department of ~~~~**
Office of the Assistant Secretary for Administration and Management
Civil Rights Center

**Informal** complaint of discrimination

EM00-11-055

Note: Complete this form, sign it, and return it to the EEO Counselor within 2 work days of your initial contact with the Counselor.
See back for additional information and for help in completing this form.

**1. Name** MICHAEL RUDGELY

**2. Job title and grade** OPERATIONS OFFICER GS/11

**1b. Anonymity—** ☑ I would like to remain anonymous.   ☐ I do not care to remain anonymous.

**3a. Home address** 16920 MATTAWOMAN LA   WALDORF, MD 20601

**3b. Office address** 4015 WILSON BLVD   ARLINGTON, VA 22203

**4. Telephone, including area code, extension**
home 301-392-6080
office 703-235-1433 x4484
8399

**5. Bases of your complaint** (Check as appropriate and specify where a blank is provided):

☐ race
☐ color
☐ national origin
☑ reprisal

☐ religion
☐ age
☐ disability

☐ sex
☐ sexual orientation*

Please specify the prior EEO activity in which you were involved and the date.

*Protected by Executive Order 13087, not by federal statute. Claimants on this basis may request a final decision, but have no hearing or appeal rights.

**6. Specify the action(s) that gave rise to this complaint.** (Please use the back of this page if needed, and check here ☐ if continued on back.)

Date(s)        Specific action(s)

I DISCLOSED INFORMATION CONCERNING A SUSPECTED PROHIBITED LABOR PRACTICE. FROM THAT TIME FORWARD I HAVE ENCOUNTERED NUMEROUS AN VARIOUS ELEMENTS THAT CAN BE CONSTRUED AS DISCRIMINATORY IN NATURE. SPECIFICALLY, I HAVE BEEN DENIED THE OPPORTUNITY FOR PROMOTIONAL ADVANCEMENT, EVEN THOUGH I HAVE BEEN ASSIGNED AND I HAVE PERFORMED HIGHER LEVEL DUTIES SATISFACTORILY.

**7. Please specify remedy(ies) you believe will resolve your complaint.** RECOGNITION FOR HIGHER LEVEL WORK. QUALITY STEP INCREASES TO MEET LEVEL AT WHICH PERFORMED

**8. Person you first contacted on this matter:** ☑ an EEO Counselor  ☐ a Civil Rights Officer  ☐ the National Coordinator of Counselors

**9. Date of contact** JUNE 2000

**10. Person's name and telephone**

**11. Have you filed a complaint on this same matter with:** N/A
☐ Administrative grievance system?
☐ A union (specify _____ )?
☐ Merit Systems Protection Board (MSPB)?

**If yes, date(s) of other filing(s)**

**12a. Representative's name**

**12b. Representative's address**

**12c. Representative's telephone**

07/27/00

**Signature** [signature]

CRC use only  Date received by CRC staff  R— 8/16/00

Issue  **B1**

IM#

08-16-00 A10:00 RCVD

**Informal** complaint of discrimination



## ITEM 6–SPECIFIC ACTIONS TAKEN
## WHICH REPRESENT DISCRIMINATION

The following conduct on the part of Melissa Stoehr, and others represent a continuing pattern and practice of discrimination against me because of my age, gender and race (White):

| DATE | ACTIONS(S) |
|---|---|
| 7/96 | My then immediate supervisor with concurrence from agency officials including officials in the Human Resource Division submitted SF-52's and other documents necessary for a promotion by material modification. This action was stopped when Melissa Stoehr became the supervisor. I remained a printing specialist although I had been performing and continued to perform other duties commensurate with what I would have performed under the accretion of duties. |
| 10/97 | I wrote to Ms. Stoehr in October 97 with an inquiry as to the status of any action to move me in grade or to assist me with advancement as had been promised by my male supervisors earlier. Ms. Stoehr did nothing with this request, and ignored my continuing efforts to advance in my career. While she was limiting my career development, she was actively assisting younger employees who female and Black in the pursuit of advancement. |
| 3/98 | I intercepted and referred to higher supervision an improper procurement document to perform services on office equipment. I had reason to believe that the document was a fraudulent transaction. When Ms. Stoehr informed me to do nothing about it, I was forced to proceed to higher levels, namely Mr. Donald Hinderlighter, who was then Director of Management Services. I was in fear for my job and integrity if I had followed Ms. Stoehr's directions. Mr. Hinderlighter stopped the improper transaction from occurring, but Ms. Stoehr shortly thereafter informed me that I was not going to advance in MSHA. The Black employee who initiated what turned out to be at least a wasteful procurement was later moved into a position in which he would progress to a grade 11 in Contracts and Procurement. Ms. Stoehr's treatment of me became more abusive after this incident. |

| 3/98 | Prior to the incident described above, I had been told that I could give some of my more routine work to other employees and take on additional work to facilitate career development and advancement. I attempted to do this but was stymied by Ms. Stoehr at each turn. She informed my second level supervisor that I was backing away from higher level duties. This was not true. I am not empowered to assign my work to other employees. Any such conduct needs the participation and approval of the immediate supervisor, which on each occasion I tried to obtain. More often then not, Ms. Stoehr would refuse to approve any transfer of work to peers. I was shocked when my second level male supervisor informed me that Ms. Stoehr had told him that I was refusing to perform work which would be career enhancing. Ms. Stoehr had never once inquired of me why I was reluctant to perform career enhancing work. |
|---|---|
| 1/99 | In frustration over continued failure to consider my work and because of the hostile work place created and maintained by Ms. Stoehr, I submitted a resignation, which I rescinded at the request of other managers in Administration and Management. |
| 1/99 | As part of my decision to rescind the resignation, I was reassigned to a supervisory position and told that there was an opportunity for the job to be upgraded. Management imposed what it described as a "probationary period" on this assignment, but I assumed the full duties of the position immediately on assignment. I was told that a noncompetitive promotion would be executed in 6 months. There would be no change in duties, supervision, or authority. At a later time (see below), a Black male grade 13 was reassigned into the work unit and I was told that my duties would be given to him to support his grade. Ms. Stoehr– who by this time had been promoted to a grade 15 management official– was participative in these decisions. |
| 6/99 | Mr. Richard Rose just prior to his retirement advised me that I was doing well and that the promised promotion should not be delayed. He was emphatic that subordinate supervision, specifically Ms. Stoehr had been instructed to treat me favorably in connection with work assignments. He retired and Ms. Stoehr refused to process the earned promotion action. |
| 11/99 | I was evaluated as effective under the Performance Management System |
| 2/00 | I wrote to Ms. Stoehr concerning the roles of new employees in the office. I was ultimately told that one of these employees a young Black male would be assuming my supervisory responsibilities. This employee had never worked in procurement and had never supervised employees in administrative support jobs. My new supervisor, John Nixon informed me of this after telling two of my employees prior to notifying me. Ms. Stoehr never responded to my inquiry. |

B3



Ms. Stoehr has engaged in a continuing pattern and practice of discriminating against me because of my age, gender and race. She created a hostile work environment and has maintained it over the last 4 years. She has forced me to remove myself from the work environment and immediately promoted younger, Black males to positions which I had been performing. These promotions and other personnel actions have gone to these employees who possess significantly less experience. She has provided false information about me to second level supervision with the result of injuring my career advancement; she has refused to provide me with grade building assignments as instructed by higher level management; she has disregarded commitments made to me by management for reasons related to my age, gender and race; she has moved a less qualified Black male into my work unit with the intention of and later did begin to remove my functions from me; she has communicated her intentions through a deputy to my subordinate employees without advising me of the impending changes; she has now promoted a less qualified employee into positions at a higher grade level than I was assigned, and she has done so knowingly and intentionally. Her conduct after I was forced to go over her head with information about an unwarranted procurement was in retribution for my protection of the government's interests after she rebuffed my efforts to deal with the matter through her. In some, Ms. Stoehr because of improper considerations of age, gender and race, and in reprisal for my exercise of protected rights in furtherance of the government's interest has discriminated against me as a pattern and practice of conduct.

## ITEM 7–
## REMEDIES WHICH WILL
## RESOLVE MY COMPLAINT

I ask that I be promoted to a grade 12 immediately in my present position and that I receive retroactive pay and adjustments to ½/96. I ask that I be immediately promoted to a grade 13 position as has been done for the young Black employee who was placed in my former work unit and who has been or will be promoted shortly. I ask that Ms. Stoehr be disciplined for her refusal to act to advance my career.

**B4**

Tuesday March 10, 1998 (afternoon), the day after I disclosed the unlawful employment practice to Mr. Hinderliter.

Melissa and Adam (Acting Chief of MSD at the time) called me in to talk (Adams office). Melissa appeared obviously upset. Melissa stated that she was not happy with my performance and after speaking with Don Hinderliter (Acting Deputy Director of A&M at the time) that she was taking steps to remove me from performing any higher level duties. She stated that she felt that I was incapable of performing higher level work and that as far as she was concerned I would not go beyond a GS-11 while in her group. She stated that I would continue to perform the duties in my PD (printing management, forms design and management, equipment analysis) only and that the PD would not go beyond a GS-11.

## COMPLAINANT'S AFFIDAVIT

I, (name) _MICHAEL A. RIDGELY, JR._

am an ✓ employee of ✓ applicant to ___ former employee of the U.S. Department of Labor's:

(Agency) _U.S. DEPARTMENT OF LABOR (MINE SAFETY AND HEALTH ADMINISTRT.)_ ✓

(Office) _ADMINISTRATION AND MANAGEMENT_

(Division) _DIVISION OF MANAGEMENT SERVICES_

(Branch) _FACILITIES AND PROPERTY MANAGEMENT BRANCH_

Located in (city and state) _ARLINGTON VIRGINIA_
in the capacity of (show both your organizational title and the classification of your job, if different):
_SUPERVISOR SUPPLY MANAGEMENT OFFICER (OPERATIONS OFFICER)_

Grade _GS-11_ between (date) _JAN 29 1999_ and (date) _JULY 30, 2000_

My telephone number during working hours is: _202/693-9724_

**I HAVE BEEN ADVISED OF THE FOLLOWING:**

I have an obligation to cooperate fully with the investigator, who has been assigned to conduct a thorough and impartial investigation of my complaint of discrimination. Therefore, I must provide a statement for the investigative record which is true and complete to the best of my knowledge and belief and which fully addresses the issues accepted for investigation. My statement must be specific with regard to names, dates, places, circumstances and related events, and disclose my firsthand knowledge of any directly related information which is relevant to the issue(s). My statement, along with my Informal Complaint, Counselor's Summary Report, my Formal Complaint, and the description of the issue(s) for investigation shall serve as the basis for the investigation. While I may voluntarily submit any additional documents or information to the investigator for consideration, it will be the investigator's responsibility to determine what evidence shall actually become part of the investigative report. If there are any documents or facts which substantiate my allegations, I must provide them to the investigator, or make them known to the investigator. I may suggest witnesses to be interviewed by the investigator. However, the investigator will decide which witnesses to interview based on relevant information he or she feels will be furnished.

My statement is made under oath (or affirmation), without a pledge of confidence, in accordance with the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Department of Labor. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown this statement or relevant portions and be given an opportunity to respond. Agency officials responsible for processing complaints of discrimination will have access to the entire investigative report. If discrimination is found, any employee accused of discrimination will have an opportunity to review a sanitized version of the report. If discrimination is found and disciplinary action is proposed, the employee accused of discrimination will have an opportunity to review the report in its entirety without deletions.

I have the right to be represented by a person of my choice during presentation of my complaint and preparation of my statement (so long as my choice does not result in a conflict of interest). I ___ have ✓ have not chosen a personal representative at this stage of my complaint. In the event I have not chosen a representative, I will advise the investigator or the Directorate of Civil Rights, in writing, should I obtain a representative at a later date.

Participants in the discrimination complaint process are specifically protected by law and the EEO regulations from any acts of reprisal, discrimination, coercion, harassment, restraint, or interference for their participation in the investigation and other phases of complaint processing.

I should not discuss my statement or any information disclosed to me by the investigator with anyone other than my personal representative.

I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.

Having reviewed the preceding information with the investigator, I solemnly ___ swear ✓ affirm that the statement which follows is true and complete to the best of my knowledge and belief, and fully addresses the issues and allegations raised by me in my EEO complaint.

_MR_
(Initials)

Form 10
(Rev. 4/90)

**F1**

Affidavit of _MICHAEL A. RIDGELY, JR._____

1. **Please provide a brief summary of your employment history with MSHA, providing grades, titles and dates promoted to the present date.**

Have served 31 years with the Mine Safety and Health Administration (MSHA), having risen through the ranks from a GS-3 to a GS-11. Served 17 years with the Office of Assessments, Civil Penalty Compliance Office (CPCO), (1971 to 1988), and 12 years with the Directorate of Administration and Management (A&M), Division of Management Services (MSD), (1988 to 2000). In July 2000, I returned to the CPCO where I currently serve.

During my former tenure of 17 years with the CPCO, I progressed through the ranks to supervisor of 20 employees in three sections—Legal Research, Special Collections, and Field Compliance.

During my 12 years tenure with the MSD, I began as an Assistant Management Analyst and progressed to become the agency's Printing Management Officer, Forms Management Officer and Analyst responsible for major equipment (property) analysis prior to the acquisition of such equipment. I progressed to Supervisory, Supply Management Officer (Operations Officer) in January 1999, which included the supervision of 5 employees in the Facilities and Property Management Branch.

Summary of Positions:
(09/71-11/73) File Clerk, Office of Assessments, CPCO, GS-3
(11/73-09/77) Assessment Clerk. Office of Assessments, CPCO, GS-5
(09/77-11/82) Research Assistant, Office of Assessments, CPCO, GS-6
(11/82-10/84) Legal Technician, Office of Assessments, CPCO, GS-7
(10/84-10/88) Supervisory Legal Technician, Office of Assessments, CPCO, GS-8
Earned an outstanding performance award for a nine-month stint as Acting Chief of the CPCO when the Chief's position became vacant. Promoted to a GS-9 while acting in the Chief's position.
(10/88-10/94) Assistant Management Analyst, Directorate of Administration and Management, Division of Management Services, GS-9
(10/94-01/99) Printing Specialist, Directorate of Administrative and Management, Division of Management services, GS-11. (Approximately 1998 I went under the Facilities and Property Management Branch under the MSD, same position).
(01/99-07/00) Supply Management Officer, Supervisory (Operations Officer), Directorate of Administration and Management, Division of Management Services, Facilities and Property Management Branch, GS-11
(07/00-Present) Civil Penalty Compliance Specialist, Office of Assessments, CPCO, GS-11

**F2**

Affidavit of _____ M͞c N̲EL A. R̲I̲D̲G̲E̲LY͞, J̲R̲.  _____

2. **Describe your job duties.**

As (Exhibit 1) shows, in January 1999, I was reassigned from a Printing Specialist GS-11 [EXHIBIT 2], to a Supervisor, Supply Management Officer (Operations Officer) [EXHIBIT 1] with a commitment from higher management that the reassigned position would be elevated to at least a GS-12 level. The position description for the reassigned position was an approximate carbon copy of the position description for the GS-14 Chief, Facilities and Property Management Branch, and also included all of the duties and responsibilities of my previous position description for the Printing Management Officer GS-11. Mr. Richard Rose, Chief, Division of Management Services, offered me the opportunity for the position and the commitment for the GS-12 because I had plans to leave the agency due to finding a new job. Consequently, in early January 1999, as a result of finding a new job, I submitted a resignation [EXHIBIT 3]. Mr. Rose's commitment was made to encourage me to stay with the government. I accepted Mr. Rose's offer and rescinded my resignation [EXHIBIT 4].

I began my new duties as Supervisor, Supply Management Officer (Operations Officer), on January 29, 1999. In that position, I supervised Arlington Operations which encompassed the day to day supervision of approximately five employees within the Facilities and Property Management Branch, Division of Management Services [EXHIBIT 5]. My immediate supervisor was Ms. Stoehr, and My second line supervisor was Mr. Rose. I planned and directed a full service operation in management support services through these five lower graded positions.

*Operations Supervisor:*
Telecommunications; Property Management; Supply Management; Mail Room; Receiving and Distribution; Printing and distribution of day to day agency communications, i.e. Arlington Information Bulletins (AIB'S), Amended Program Policy Manuals (APPM's), etc.; Facilities Management: Maintenance/Services of general office equipment, i.e., copier/fax machines. Office moves and logistics.

Additional Duties included:

*Printing Management Officer:*
Prepared specifications for printing, Created artwork; Prepared graphics; Coordinated logistics and distribution of printing projects; Primary liaison on printing matters between MSHA and DOL and GPO.

*Forms Management Officer:*
Conducted Forms surveys and workflow analysis of program areas for Forms needed. Conducted analysis in the development and utilization of new and revised Forms; Designed forms, and prepared artwork; . Assigned and maintained form control numbers; Coordinated overall administrative user/end user aim (purpose) of forms.

Provided equipment (copier/fax, etc.) analysis and coordination (MSHA wide); Conducted office surveys and work flow analysis to determine equipment needs; Evaluated equipment from various manufactures; Conducted cost and life cycle analysis; Made final recommendations for the purchase of equipment

PCR Form 13A
v. 4 /90)

F3

Affidavit of _MICHEL A. RIDGELY, JR._____

3. **Who is your immediate supervisor?**

Ms. Melissa Stoehr

DCR Form 13A
(v. 4/90)

F4

Affidavit of _____MICHAEL A. RIDGELY, JR._____

**4.  How long has he/she been your supervisor?**

Ms. Stoehr became my first line supervisor in July 1997.  At that time, I served as Printing Management Officer, GS-11. Ms. Stoehr supervised my position, serving as the Chief, Facilities and Property Management Branch, GS-14.  Over the next few years (1997 through 2000) Ms. Stoehr continued to be my first line supervisor until approximately early March 2000, when I began working under Mr. Charles Brinkley.  Later in March 2000, Mr. Nick Nixon was brought on board as the Chief, Facilities and Property Management Branch, GS-14.  At that time, Mr. Brinkley reported to Mr. Nixon who reported to Ms. Stoehr who had assumed the position of Chief, Division of Management Services, GS-15.

During the period (1999-2000) Ms. Stoehr held a number of (Acting) management positions within the Directorate of Administration and Management (A&M) up to and including the level of Acting Director for a short period of time.  These opportunities afforded Ms. Stoehr control over programs including the Human Resources Division.  These opportunities came to her as a result of a number of on-going reorganizations within A&M due to retirements and restructuring processes.  Due to her senior alignment within the A&M organization, Ms. Stoehr through Mr. Nixon was able to ultimately forced me out of my position as Supervisory Supply Management Officer (Operations Officer) and replace me with a younger Black male employee (Mr. Charles Brinkley) at two grade levels (GS-13) higher than myself. This transition occurred without benefit of competition or regard to Merit Staffing regulations [EXHIBIT 6].

F5

Affidavit of ___M.╱ＥL A. RIDGELY, JR._____

**5. You allege a continual pattern of age, gender and race discrimination dating back to 1996. Please explain why you failed to file an EEO complaint from 1996 through 2000?**

This is primarily due to the continued encouragement and hope given by management that career opportunities would be forthcoming.

In July 1997, Ms. Stoehr assumed the position as Chief, Facilities and Property Management Branch, Division of Management Services, Directorate of Administration and Management. When she began in this position, management had already initiated processes to promote me by accretion of duties because of the work I had been doing in my position. This effort actually began in 1994, was interrupted by a reshuffling of the organization in 1995, and resumed in 1996 [EXHIBIT 7]. The effort continued into 1997 until Ms. Stoehr was placed as my supervisor in July of that year. I was reluctant to file any formal complaints due to the fact that higher management continued to encourage me that opportunities for career growth would occur. In fact, on October 7, 1997, I e-mailed Ms. Stoehr to inform her that my option for early-out retirement would expire at the end of calendar year 1997 [EXHIBIT 8]. In my e-mail I asked Ms. Stoehr what my options were, and if she could arrange a meeting for me to discuss the options with her and my second level supervisor, Mr. Don Hinderliter, Chief, Division of Management Services.

In mid-December 1997, I met with Mr. Hinderliter, and asked him what opportunities would be available to me if I opted not to go out on early-out retirement. Mr. Hinderliter assured me that there would be a number of options opening in the near future. He stated that serious thought had been given to establish positions in both property and space management, and both positions would have potential to the GS-13 level. Mr. Hinderliter indicated that he felt that I would work out well in either of these positions once they were established. Based on that conversation, I decided to forego the early-out retirement option.

Due to the continued encouragement given by higher management that career advancement opportunities would eventually come, I felt obligated to remain complacent. In late 1998, realizing that the promised opportunities were not becoming a reality, I found employment out side of government near a location close to my residence. This is when I submitted a resignation. After submitting the resignation, Mr. Rose, Chief, Division of Management Services, made me the offer for the Supervisory, Supply Management Officer position, with the commitment of the eventual GS-12. It was because of this commitment that I decided to stay with the government.

Affidavit of _MICHEL A. RIDGELY, JR._

6. **Please describe in detail the events that occurred in 2000 which led you to believe you were being discriminated against on the basis of your age?**

During the course of my tenure (1999-2000) as Supervisor, Supply Management Officer, I was seldom asked to attend meetings, which included Ms. Stoehr and members of the staff I supervised. I often learned through the members of my staff that they had been assigned duties directly by Ms. Stoehr without the benefit of her keeping me in the loop. The majority of my staff consisted of minorities and women, most if not all younger then myself.

In early March 2000, I learned from my subordinate employees that a number of "new" employees would soon be reporting to my organization. I inquired (through e-mail) of my supervisor, Ms. Stoehr , asking her if she and I could meet to discuss the respective role of the new employees and their and my functions. After several requests, Ms. Stoehr responded stating (see **EXHIBIT 6**) that in essence the new employee would be taking over my duties as supervisor. I responded to her e-mail requesting a person to person meeting with her to discuss functions in more detail. She failed to respond to my request. After several attempts, I was obligated to consult with MSHA's EEO Officer, Ms. Diane Dize, who in turn intervened and spoke with the (then) Acting Deputy Director of A&M, Mr. Michael Thompson. During my meeting with Mr. Thompson, I was instructed by him to make one more attempt at requesting a meeting with Ms. Stoehr. I did has he instructed, and was granted a meeting with Ms. Stoehr (see **EXHIBIT 9**).

During the meeting with Ms. Stoehr, she reiterated her comments in her e-mail that Mr. John Nixon would be the new Branch Chief, and Mr. Charles Brinkley would have oversight of operations. When I asked her where I would fit within the organization and would I be promoted as promised, she replied, once Mr. Nixon came on board he would be making those decisions.

Mr. Brinkley came on board in mid-March 2000, and Mr. Nixon came on board near the end of March 2000.

In mid-March 2000, I submitted a request for a 1-day training seminar teaching the elements of writing performance appraisals. I requested this class because I was in the process of preparing new performance standards for my subordinate employees. The request for training was denied [**EXHIBIT 10**] by Ms. Stoehr through Mr. Adam Hare, the (then) Acting Chief, Management Services Division. In fact, Mr. Brinkley, representing me as my supervisor, called Ms. Stoehr, (then) serving as Acting Deputy Director, Administration and Management, with the speaker phone on to ask her about the training class I requested. Ms. Stoehr, unaware that she was on the speaker phone stated "What does he want to take that for?!!!" in a very nasty voice. When she said this, Mr. Brinkley immediately turned the speaker off. In all respect to Mr. Brinkley, he tried earnestly to persuade Ms. Stoehr to allow me to take the training, but, to no avail.

MR Form 13A
(v. 4/90)

F7

Affidavit of  *M.* *'EL A. RIDGELY, JR.*

7. **Provide the names of employees who are similarly situated in grade and title during 2000 period and explain how you were treated differently than your peers.**

At the time I was supervisor (1999-2000), there were to my knowledge no other employees in similar grade and title. In mid-March 2000, Mr. Brinkley assumed the role as supervisor.

In late May 2000, a subordinate employee, Mr. Rudy Watkins, informed me that Mr. Nixon informed him that Charles Brinkley would soon officially become the new supervisor of operations and that I would no longer be supervisor.

To the best of my knowledge, with the exception of Mr. Brinkley, who was a GS-13, there were no other employees similarly situated.

However, there was a vacancy announcement advertised in January 2000, for a position located at MSHA's National Mine Health and Safety Academy [EXHIBIT 11]. The announcement was for a Supply Management Officer GS-12. This announcement contained a number of the duties I carried out in my position as Supervisor, Supply Management Officer, GS-11.

On July 31, 2000, 1 day after I began my tenure with the Assessment Office, a vacancy announcement advertising a Supply Management Specialist GS-11/12 was posted [EXHIBIT 12]. This announcement contained only part of the responsibilities covered in my position as Supervisor, Supply Management Officer, GS-11. Later in August 2000, (less than a month after I bgan my tenure with the Assessment Office) another vacancy announcement for a Property Management Officer, GS-12 (with potential to a GS-13) was posted [EXHIBIT 13]. This position contained only part of the responsibilities in my position as Supervisor, Supply Management Officer, GS-11.

**F8**

Affidavit of _MI___EL A. RIDGELY, JR._____

8.  **Describe the events and provide the names of employees who were similarly situated in grade and title during 1996 period who were younger and treated differently**

In 1998, I was told that I would be detailed to higher level duties and that this detail would coincide with someone being detailed into my position to perform a number of that position's lower level functions. This was to affording me the opportunity of devoting full attention to the higher level work. This person was Ms. Joanne Brothers. At that time it was suggested that my detail begin on or around the time the then supervisor of operations, Ms. Grace Dewan, (a younger female) was to be detailed to the Department to begin a 120 day detail. On or around April 1, 1998, Ms. Dewan's detail officially began. However, I was never officially afforded a detail into higher level work as promised and no one was officially detailed to perform my lower level duties. Subsequently, as a result of Ms. Dewan's detail, she was hired by an agency located at the main building (Department of Labor) as a GS-12.

Affidavit of _MI͞ EL A. RIDGELY, JR._

9. **You allege that Ms. Stoehr has been your supervisor since 1996 and that she denied you the opportunity to advance in your career. Please explain the events which caused you to believe Ms. Stoehr discriminated against you on the basis of your sex (starting from 1996 up to the present date). Please be specific with names and titles and telephone numbers of the persons treated differently.**

As described in question number 8, During the time I was to be detailed to higher level duties, Ms. Joanne Brothers (a female) was to be detailed to perform my lower level work, thus giving her the opportunity for advancement. Instead of this taking place, I was required to perform all of my duties as well as any higher level work assigned. During this time I made numerous attempts to submit my lower grade level assignments to Ms. Stoehr so she could assign the work to Ms. Brothers so I could be free to perform higher level duties. Ms. Stoehr returned my work with notes instructing me to complete the work [EXHIBIT 14].

When I became supervisor in January 1999, my operation was short staffed. Ms. Joanne Brothers was one of the members of my staff. She was a part time employee who was scheduled to work five hours a day five days a week. For a period of time, Ms. Brothers had begun taking on average two to three sick leave days each pay period. This caused Ms. Brothers to have a negative sick leave balance on a continuing basis at the end of each pay period. The negative balances continued to become chronic in nature. Out of concern that my continual certification of a negative balance would eventually cause administrative problems, I brought the matter to the attention of Ms Stoehr. Ms. Stoehr offered no assistance and in fact told me that I should be happy to have Ms. Brothers come in at all. This attitude and over protection of Ms. Brothers substantially undermined my abilities to efficiently supervise the office.

Near the end of my tenure as supervisor, I found out through my other subordinate employees that Ms. Brothers, with Ms. Stoehr's recommendation and assistance had qualified for a career ladder development program to a GS-12 within the Directorate of Administration and Management. It became clear to me then, why Ms. Stoehr exhibited such over protection toward Ms. Brothers back when I need Ms. Stoehr's support.

DCR Form 13A
r. 4/90)

**F10**

Affidavit of _MI___EL A. RIDGELY, JR._____

**10. What are your current job duties?**

At the time Mr. Brinkley came on board my supervisory responsibilities became less and less. Mr. Brinkley took the lead on a number of assignments, and in fact informed a number of my regular customers that they should be going through him. I retained the duties that were originally in my position description as a Printing Specialist, GS-11, but, even these duties were under the supervision of Mr. Brinkley. Concerned that my responsibilities were dwindling, I approached Mr. Nixon about the eventual role I would play in the organization and about the prospects of being promoted. Mr. Nixon told me that he had heard (did not mention the source, but gestured that it was Ms Stoehr) the scenario regarding my role in the organization and my promised promotion and was told that it was all in my head. I showed him copies of my position descriptions. I then pointed out the differences in the position descriptions from Printing Specialist, GS-11 to the Supply Management Officer (Operations Officer) GS-11, and a copy of the resignation triggering the latter, he admitted that the matter of the promotion being in my head seem suspicious. However, he told me that ultimately, my supervisory duties would be taken from me and given to Charles Brinkley, this would be done to justify Mr. Brinkley's GS-13 grade. When I asked him if there would be any hope for me being promoted, he stated that after taking away the supervisory responsibilities from me he would have a difficulty time justifying a GS-11.

See **EXHIBIT 15**

Page _10_ of Page _27_
Initials: _____

SR Form 13A
(v. 4/90)

**F11**

Affidavit of _MI__EL A. RIDGELY, JR._____

**11. When did you assume new job duties?**

On or around the middle of March 2000, after Mr. Brinkley came on board with the Facilities and Property Management Branch.

Affidavit of _MICHEL A. RIDGELY, JR._

12. Describe those duties?

As stated in question 10, the duties were primarily those under the position description for the Printing Specialist, GS-11 [EXHIBIT 2] which are briefly described in question number 1. All other duties I previously held fell under Mr. Brinkley's supervision once he came on board with the Facilities and Property Management Branch. In fact, the duties under the Printing Specialist position also fell under his supervision.

Page _12_ of Page _27_
Initials: _m_

Form 13A
. 4 /90)

Affidavit of _MI__EL A. RIDGELY, JR._____

13. Are you the only person performing these duties?

During the period between 1988 to 2000, I was the only employee located at MSHA Headquarters performing the major printing duties as Printing Management Officer..

Form 13A
. 4/90)

Page *13* of Page *27*
Initials: _____

F14

Affidavit of _MICK A. RIDGELY, JR._

**14. You allege an ongoing hostile environment. Describe the events or incidents which cause you to believe the office environment is hostile?**

As stated in question number 8, I was supposed to have been afforded a detail to higher level work with Ms. Brothers detailed to perform my lower level duties. This never occurred. Ms. Stoehr returned my lower level work to me with notes instructing me to complete the assignments myself. I later learned that Ms. Stoehr was telling Mr. Hinderliter that I was reluctant to turn over my lower level work, using that as a reason for removing my higher level opportunities [EXHIBIT 16]. This caused my relationship with Mr. Hinderliter to deteriorate form the positive relationship [EXHIBIT 17] I had with him prior to Ms. Stoehr's coming on board.

Additionally, Once I became a supervisor, I was shut out of and denied the opportunity of attending meetings. Meeting including both with my staff and Ms. Stoehr, or with Ms. Stoehr alone. I was also denied opportunities for training.

DCR Form 13A
. 4/90)

F15

Affidavit of MICK A. RIDGELY, JR.

**15. Why do you believe your supervisor responsibilities were given to a younger Black male?**

It is my understanding that Mr. Brinkley was himself a victim of discrimination. Mr. Brinkley was serving as the Chief, Civil Penalty Compliance Office (CPCO) prior to being reassigned to the Facilities and Property Management Branch. While serving as Chief, of the CPCO, Mr. Brinkley's White male managers (persuaded?) him to move to the Facilities and Property Management Branch.

Additionally:
On March 3, 1998, I intercepted what appeared to be an improper procurement action **[EXHIBIT 18]. I** reported the apparent improper procurement action to Ms. Stoehr. Ms. Stoehr told me not to worry about the matter. I told her that our Morgantown, WV District office wanted answers and that my name appeared on the documents. I persistently reiterated my concerns to her to address the matter. Ms. Stoehr became agitated and told me that she was busy and to forget about my concerns. With apprehension over Ms. Stoehr's lack of interest, I reported the apparent improper procurment action to my second level supervisor, Mr. Don Hinderliter, the (then) Acting Director for Administration and Management. On March 10, Mr. Hinderliter addressed the improper procurement action by reiterating existing procurement policy.
(EXHIBIT)

A few days following my disclosure to Mr. Hinderliter, Ms. Stoehr met with me. During the meeting, Ms. Stoehr informed me that all opportunity to perform higher level work was going to be taken from me, and I would no longer have the opportunity for advancement to a GS-13 level. That I would be required to work only in the duties of a Printing Specialist GS-11 and would remain there as long as I work for her.

It should be noted, that the Procurement Officer (a Black male) responsible for the apparent improper procurement action, was a GS-7 at the time of the action. Since that time, and while under Ms. Stoehr's supervision, and with her knowledge of the action, this individual has been promoted by her from a GS-7 to a GS-12. I, on the other hand have remained a GS-11.

F16

Affidavit of _MICK A. RIDGELY, JR._

16. **Identify the duties that were given to the younger Black male.**

Mr. Brinkley was given all of the supervisory duties originally held by me as described in question number one above. I primarily had the responsibilities under the Printing Management Specialist position. Mr. Brinkley also supervised those responsibilities.

See **EXHIBIT 6**

Affidavit of _MICH⟩ A. RIDGELY, JR._

17. Identify the young Black male by name, grade and title.

Mr. Charles Brinkley, GS-13, Supervisory, Supply Management Officer (Operations Officer).
Mr. Brinkley currently hold the position of Chief, Facilities and Property management Branch, GS-14.

Page 17 of Page 27
Initials: M

DCR Form 13A
v. 4/90)

**F18**

Affidavit of ___MICH A. RIDGELY, JR.___

**18. Identify the young Black male's job duties prior to assuming your duties.**

To the best of my knowledge, Mr. Brinkley's previous duties were similar in nature to the duties I held when I supervised in the Office of Assessments, Civil Penalty Compliance Office. The duties are briefly described in question number one above. The difference in the duties is divided only by the fact that I performed them 12 years earlier. Since that time there had been some technological and system changes, but, the overall responsibilities and functions were similar in nature.

Page _18_ of Page _2 7_
Initials: ___M___

R Form 13A
v. 4/90)

**F19**

Affidavit of _MICK A. RIDGELY, JR._

**19. Describe how you are better qualified than the young Black male.**

At the time Mr. Brinkley came on board with the Division of Management Services, I had approximately eleven years experience with the Division. This experience included substantial hands on experience dealing with the responsibilities of the Division. To the best of my knowledge, Mr. Brinkley had little or no experience in the functions of the Division. Additionally, I also had seventeen years prior experience from my tenure with the Office of Assessments, Civil Penalty Compliance Office. The experience acquired from that tenure was similar in nature to that of Mr. Brinkley's tenure in the same office. He and I served the Office of Assessments in positions closely approximately to one another with the exception that I served there 12 years earlier.

When Mr. Brinkley came on board with the Division of Management Services, I acquainted him to a number of responsibilities the office was required to perform. Once I left the Division to take the position with the Office of Assessments Mr. Nixon on a number of occasions contacted me to assist him in issues he and Mr. Brinkley were unfamiliar. It should be note; that on each of those occasions, I gladly assisted with their concerns [EXHIBIT 23].

Page _19_ of Page _27_
Initials: _MR_

DCR Form 13A
v. 4 /90)

F20

Affidavit of _MICK A. RIDGELY, JR._

**20. Describe the false information Ms. Stoehr provided to the second level supervisor.**

As described in questions 9 and 14, Ms. Stoehr informed Mr. Hinderliter that I was reluctant to trade off my lower level work for higher level work.

**See EXHIBITS 14 and 16**

Affidavit of _MICH A. RIDGELY, JR._

21. Identify the second level supervisor by name, title and grade.

Mr. Don Hinderliter, (Acting) Deputy Director, Administration and Management, GS-15 (Retired)

And late (1999),

Mr. Richard Rose, Chief, Division of Management Services, GS-15 (Retired)

CR Form 13A
v. 4/90)

F22

Affidavit of ___MICH___ A. RIDGELY, JR._____

**22. How were you harmed by this alleged false information?**

As the e-mail [EXHIBIT 16] shows, Mr. Hinderliter began to doubt my abilities. Former e-mail (before Ms. Stoehr came on board with the Division) [EXHIBIT 17] showed Mr. Hinderliter and I shared a good relationship. Latter e-mails [EXHIBIT 19] show that he had begun to see beyond Ms. Stoehr's false information. These later e-mails show that Mr. Hinderliter was aware of Mr. Rose's commitments to me regarding the promotion to GS-12.

DCR Form 13A
Rev. 4/90)

F23

Affidavit of _MICH A. RIDGELY, JR._

23. **If you have applied for positions, identify the positions, date(s) you applied and job vacancy announcement numbers.**

I applied for five different positions within MSHA in January/February 2000 [EXHIBIT 22]. The Human Resources Division erred on each and every one of the applications. It seems suspicious that during this time, Ms. Stoehr was Acting in positions that oversaw the functions of the Human Resources Division.

SR Form 13A
v. 4/90)

Page 23 of Page 27
Initials: _M_

**F24**

Affidavit of _MICH A. RIDGELY, JR._

24. **Identify the grade building assignments you were denied.**

I was denied the opportunity for official details to higher level work even though other (younger female) employees were given such opportunities. I was denied opportunities to attend meetings that involve my staff's functions and responsibilities. I was denied training opportunities.

DCR Form 13A
. 4/90)

Page _24_ of Page _27_
Initials: _M__

**F25**

Affidavit of _MICH. A. RIDGELY, JR._____

**25. Provide an organizational chart or listing of the personnel within your unit with grades and titles.**



**Directorate of Administration and Management**
**Telephone Numbers**

**Headquarters - Arlington, Virginia**

**Office of the Director**

| | | |
|---|---|---|
| Telephone:<br>(202) 693-9800 | Fax Number:<br>(202) 693-9801 | E-Mail Address:<br>Meyer-David@msha.gov |

**Budget and Finance Division**

| | | |
|---|---|---|
| Telephone:<br>(202) 693-9810 | Fax Number:<br>(202) 693-9811 | E-Mail Address:<br>Charboneau-Thomas@msha.gov |

**Human Resources Division**

| | | |
|---|---|---|
| Telephone:<br>(202) 693-9855 | Fax Number:<br>(202) 693-9856 | E-Mail Address:<br>Flahie-Regina@msha.gov |

**Management Services Division**

| | | |
|---|---|---|
| Telephone:<br>(202) 693-9825 | Fax Number:<br>(202) 693-9826 | E-Mail Address:<br>Stochr-Melissa@msha.gov |

**Records Management Division**

| | | |
|---|---|---|
| Telephone:<br>(202) 693-9820 | Fax Number:<br>(202) 693-9821 | E-Mail Address:<br>Haywood-Lynnette@msha.gov |

**Office of Diversity, Outreach & Employee Safety**

| | | |
|---|---|---|
| Telephone:<br>(202) 693-9880 | Fax Number:<br>(202) 693-9881 | E-Mail Address:<br>Thompson-Michael@msha.gov |

R Form 13A
v. 4/90)

Page _25_ of Page _27_
Initials: _MR_

Affidavit of _MICH A. RIDGELY, JR._

26. Provide the names, grades and titles of witnesses who can attest to the alleged discrimination.

Ms Frankie Sanks, Telecommunication Specialist, GS-11, 202/693-9845

Mr. Keith Pendergast, Program Analyst, GS-11, 202/693-9844

Ms Diane Dize, EEO Officer, GS-12, 202/693-9886

Mr. Rudy Watkins (I will have to call you with Mr. Watkin's new telephone number telephone number)

DCR Form 13A
v. 4/90)

Page _26_ of Page _27_
Initials: _M_

**F27**

Affidavit of _MICH A. RIDGELY, JR._

27. **Provide any supplemental information at this time.**

**EXHIBIT 20** – e-mail from Ms Stoehr denying the agreement with me by her supervisor (my second line supervisor) Mr. Richard Rose. This e-mail was written after Mr. Rose retired in June 1999.

**EXHIBIT 21** – A memorandum I submitted to Ms Patricia Slivey during the time she acted as Director, Administration and Management. Ms Silvey was transferred to another program area 2 day after this memo was given to her.

**EXHIBIT 24** – e-mails showing that I was placed as Acting Chief, Facilities and Property Management Branch each time Ms Stoehr was absent from the office.

**EXHIBIT 25**- e-mails showing that Mr. Brinkley place as Acting Chief once he came on board.

**EXHIBITS 26 and 27** – Performance Appraisals showing that I was performing at a satisfactory level during the time I was serving as Supervisor, Supply Management Officer (Operations Officer).

Page 30
*INCLUDING*
*COPIES*

I have reviewed this statement, which consists of _27_ pages, and hereby solemnly ___ swear _✓_ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____        _10/10/02_
_____/(Signature of Deponent)_              (Date)

Signed before me at (Street and City) _1100 Wilson Blvd., Arlington, VA 22209-3939_
on this _10th_ day of _October_ _____ _2002._

DCR Form 13B      _Dorothy Johnson_
(Rev. 4/90)          (Signature of Investigator/Witness)

F29



## WITNESS' AFFIDAVIT

I, (name) __Melissa Stocks__ _____ am an ✓ employee of

_____ applicant to _____ former employee of the U. S. Department of Labor's:

(Agency) __U S Department of Labor Mine Safety & Health Admin.__

(Office) __Administration and Management__

(Division) __Management Service Division__

(Branch) _____

Located in (city and state) __Arlington, VA__

in the capacity of (show both your organizational title and the classification of your job, if different):
__Management Services Officer / Chief Management Services Division__

Grade __15__ between (date) __12/99__ and (date) __present__

My telephone number during working hours is: __202-693-9827__

### I HAVE BEEN ADVISED OF THE FOLLOWING:

I am required by Federal regulations and Department of Labor policy to cooperate fully and promptly with the investigator who has been assigned to conduct a thorough and impartial investigation into a complaint of discrimination against the Department of Labor. I must provide a statement for the investigative report which is true and complete to the best of my knowledge and which discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is provided under oath (or affirmation), without a pledge of confidence, in accordance with Equal Employment Opportunity Commission rules and regulations, and the Department of Labor's policy. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of my affidavit and be provided an opportunity to respond for the record. In addition, the complainant and appropriate Departmental officials involved in the EEO complaint process will receive the entire investigative file. I have the right to review my statement prior to signing it and may make initialed corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

I am entitled to representation by a person of my choice during my participation in the EEO complaint process, so long as my choice does not result in a conflict of interest. I _____ have ✓ have not chosen a personal representative at this time.

EEO regulations specifically protect participants in the EEO complaint process from any acts of reprisal, discrimination, coercion, harassment, restraint, or interference as a result of their participation in the complaint process. I should not discuss any statement or other information disclosed to me by the investigator with anyone other than my personal representative.

Having been advised of the above information and informed of my role as a witness in the investigative process, I solemnly ✓ swear _____ affirm that the statement which follows is true and complete to the best of my knowledge and belief, and addresses the issues and concerns raised with me by the investigator.

_Mas_
(Initials)

DCR Form 12
(Rev. 4/90)

Affidavit of _____ *Melissa Stochr* _____

I believe my copy of Mr. Ridgely's affidavit is not complete without copies of the Exhibits. In the interest of providing a timely response, I am responding without benefit of having the Exhibits for review.

Mr. Ridgely testified that he was reassigned from a Printing Specialist GS-11 position to a Supervisor, Supply Management Officer with a commitment from higher management that the reassigned position would be elevated to at least a GS-12 level.

1. Please respond.

I did not tell Mr. Ridgely that the reassigned position would be elevated to at least a GS-12 level. Mr. Ridgely alleges that Mr. Richard Rose promised him a GS-12 if he did not resign and if he retained his federal employment. Mr. Rose should be contacted regarding this issue.

2. Did you ever consider promoting Mr. Ridgely to the next level?

Yes.

3. How was Mr. Ridgely's position, Supervisor, Supply Management Officer similar to the GS-14 Chief, Facilities and Property Management Branch?

The positions supervise the some of the same administrative support areas. The supervisory supply management officer position that Mr. Ridgely occupied had responsibility for the programs in support of only the Arlington office location. The supervisory supply management officer position that Mr. Ridgely occupied also had responsibility for forms, printing, and copier/fax programs nationally and the vehicle program-Eastern region. The Chief, Management Services Division position has the responsibility for the programs at the regional and national level (including policy) and, in addition, has responsibility for providing administrative support directly to the Denver and Arlington offices.

Mr. Ridgely alleges that during the period 1999-2000, you held a number of "Acting" management positions within the Directorate of Administration and Management, up to and including the level of Acting Director for a short period of time which afforded you control over programs including the Human Resources Division. He further alleges that in your capacities as "Acting" you had control over programs and forced him out of his position.

4. Please respond. (See page 4 of Mr. Ridgely's affidavit).

Page __1__ of Page __11__
Initials: __*MSO*__

F3.13



Affidavit of ___Melissa Steeba___

I served as Acting Chief, Management Services Division from 7/18/99 through 9/16/99. I served as Acting Deputy Director, Administration and Management (A&M) from 4/4/00 through 7/24/00. The Deputy Director, under the direction of the Director of A&M, has responsibility for all of the Divisions under the directorate. Mr. Ridgely's allegation that I used my position to adversely affect his career is untrue. Mr. Ridgely's allegation that I forced him out of his position so that I could replace him with a younger back male employee (Mr. Charles Brinkley) is untrue. Mr. Marvin Nichols approved Mr. Brinkley's detail to the position of Supply Program Specialist GS-14 within the Facilities and Property Management Branch on 8/15/99. At that time, I knew who Mr. Brinkley was, but had no personal knowledge of his work performance and had barely spoken to him during my tenure at MSHA. Shortly before Mr. Brinkley's detail to the Facilities and Property Management Branch, Ms. Patricia Silvey informed me that Mr. Brinkley would be detailed to the Facilities and Property Management Branch on a temporary promotion while I was detailed to the position of Acting Chief, Management Services Division. Mr. Adam Hare and Ms. Patricia Silvey extended Mr. Brinkley's detail in this position on 9/14/99 to terminate on 9/23/99. Ms. Silvey and Mr. Hare initiated and approved the action to terminate the detail and Mr. Brinkley returned to his position of record on 10/9/99. On 2/13/00, Ms. Lynnette Haywood and I approved a lateral reassignment for Mr. Brinkley to assume the position of Management Program Analyst (Security Manager) GS-13 within the Facilities and Property Management Branch. The duties of this position were management and oversight of the Agency's national security program, studies and analysis of all Branch programs, including operations, national and regional programs, and evaluate work processes, operating procedures and productivity, make recommendations for problem resolution and/or redistribution of workload, and direct, through subordinate supervisor the activities of the Arlington operation staff.

Please review the attached copies of e-mails you sent to staffers delegating Mr. Ridgely as "Acting" in your absence.

There were no copies of e-mails attached.

5. During the times Mr. Ridgely "Acted" in your absence, please assess his performance.

To the best of my recollection, Mr. Ridgely's performance was acceptable.

6. Was Mr. Ridgely's performance of the caliber to warrant a promotion to the next level (GS-12)?

The Supervisory Supply Management Officer position that Mr. Ridgely held had the full promotion potential to a GS-11.

Page __2__ of Page __11__
Initials: __Mee__

Affidavit of _____ Melissa Stoehr _____

**7. If not, why?**

The Supervisory Supply Management Officer position that Mr. Ridgely held had the full promotion potential to a GS-11.

In your affidavit, you testified that numerous opportunities were provided to Mr. Ridgely to demonstrate advancement to the next level.

**8. Please provide examples and documentation where these opportunities to demonstrate advancement to the next level were provided to Mr. Ridgely.**

In my affidavit, I testified that Mr. Ridgely was given assignments that, if performed and performed well, could have demonstrated that he could perform higher level work. Mr. Ridgely did not perform at the higher level and did not take the initiative to demonstrate that he could perform the higher level work.

Attachment 1    Mr. Ridgley was given an assignment to prepare MSHA's 1998 Energy Report in July 1997. Preparation of the agency energy report is higher level work and part of the National Space Manager's duties (a GS-13 position). As the attachments demonstrate, Mr. Ridgley did not prepare the report. Sufficient time was given to complete the work (6 months). He did not request help and although help was offered, committed to completing the assignment several times, but, in fact did not complete the project. The report was eventually assigned to Mr. Norton Canterbury.

Attachment 2    Mr. Ridgely was given an assignment to prepare data bases (inventories) for copier equipment and office space nationwide. This assignment was given to Mr. Ridgely prior to February 1998 by Mr. Hinderliter, Chief, Management Services Division. After multiple conversations and meetings regarding the project, it was not completed by Mr. Ridgely and the project was eventually assigned to another employee.

**9. When did you discuss these advancement opportunities with Mr. Ridgely. Provide dates.**

Mr. Ridgely and I discussed his advancement opportunities on more than one occasion. I do not recall the dates of these conversations.

I do have notes from a meeting that Mr. Ridgely and I had on 1/23/98. Mike had requested a meeting so that we could discuss what opportunities would be available to him if he did not

Page __3__ of Page __11__
Initials: ___ MS ___

Affidavit of _____ *Melissa Stockin* _____

retire. During that meeting, I informed Mr. Ridgely that he needed to establish credibility with me. Previously, I had seen him pulling items from a garbage can in the hall, but when I asked him about the Energy report that was due, he told me he hadn't had time to complete the assignment. I also informed him that I couldn't, in good conscious, help him if he didn't demonstrate that he could and would produce higher grade, good quality work on time. I told him that I needed help with the space program and the space projects needed to be completed on time. I told him that he had a previous opportunity to get experience with the national space inventory and space program (indoor air quality issues, etc.) and he hadn't taken advantage of the opportunity. Mike told me that he really wanted a chance to advance. I gave Mike new deadlines for the projects that had been assigned to him and that were overdue so that he would have another chance to demonstrate he could do the higher level work. Two examples are as follows:

| 1/23/98 | 1:00pm | Energy Report (This report must be submitted to the Department. Mike would either turn in the completed report or I would have to assign it to someone else). |
| 2/6/98 | ----- | Lease expiration chart/schedule format |
| 2/13/98 | ----- | Format for space inventory/data base |
| 2/20/98 | ------ | 1 page trip reports on the Beckley Copier issues (Mike had taken the trips prior to my 7/97 employment at MSHA.) |

I also have notes from a meeting that Mr. Ridgely, Adam Hare and Don Hinderliter and I attended on 3/3/98 from 3:00pm to 3:30pm. During this meeting, Mike. Ridgely provided Don a copy of the Beckley copier trip report. It was also understood that Mike Ridgely would take the lead on the copier database. Mr. Hinderliter asked for the status of the space data base and a report on his work and meetings with Mark Davis. In order to allow Mr. Ridgely the opportunity to concentrate on the higher level work assignments, he was asked and he agreed to pass along forms printing information to George Greenwald and would give me a list of the work he could hand off to another employee by 3/20/98. Note: Mr. Ridgely did not provide me with a list of the assignments/work he could hand off to another employee (Ms. Brothers).

10. During these discussions with Mr. Ridgely on advancement opportunities, what feedback did he provide.

Page __4__ of Page __11__
Initials: __Mes__



Affidavit of _____ *Melissa Stecha* _____

I recall Mr. Ridgely expressing his desire to "get a GS-12". I also recall that Mr. Ridgely said that he would do the higher level work so that he could advance.

11. Provide the names of the reviewing officials for Mr. Ridgely's appraisals.

| | | |
|---|---|---|
| Donald Hinderliter | (703) 655-3466 | Retired - Current Telephone Number |
| Richard B. Rose | (703) 430-8412 | Retired - Current Telephone Number |
| Adam Hare | | Retired |
| Patricia Silvey | | |
| Lynnette Haywood | (703) 235-9801 | |

12. What did you tell the reviewing officials, if anything, concerning Mr. Ridgely's performance during the time you rated his annual performances.

I discussed Mr. Ridgely's performance and my evaluation of his performance with the reviewing officials. Mr. Rose, Mr. Hinderliter and Mr. Hare had knowledge of Mr. Ridgely's performance first hand since they had interacted with him during the periods of performance that were being evaluated. The Reviewing Officials should be contacted to provide additional information if questions exit as to Mr. Ridgely's performance evaluations.

13. Please provide documentation where Mr. Ridgely was given work at the higher level and failed to demonstrate that he could perform at the higher level.

See Attachments 1 and 2. Additional documentation is not available since the assignments were given several years ago.

14. Did you ever have a conference with Mr. Ridgely concerning his performance and his desire for promotion to the next level?

Yes. Please see my response to question 9. Also, I believe that Mr. Ridgely met with Mr. Rose, Mr. Hinderliter and Mr. Hare regarding opportunities for advancement on several occasions.

15. If so, when?

Please see my response to question 9.

16. Did you discriminate against Mr. Ridgely on the basis of his age when you placed Mr. John Nixon in the position as Branch Chief?

Page _5_ of Page _11_
Initials: _MS_



Affidavit of _____ Melissa Stock _____

No. The Chief, Facilities and Property Management Branch position (Supply Management Officer GS-14) became vacant when I was promoted to the Chief, Management Services Division.

17. How did Mr. Nixon become Branch Chief? (Was he selected through merit staffing, transferred, etc.?)

Mr. Nixon was selected through merit staffing. The position was advertised as a vacancy. The Human Resources Division received the applications and processed them accordingly. The list of applicants was provided to me. The applicants were interviewed by the Chief, Acquisition Management Branch (Mr. Adam Hare) and myself, the same questions were asked each candidate during interviews and Mr. Adam Hare and I agreed on the selection of Mr. Nixon.

18. Please respond to Mr. Ridgely's allegation that during the course of his tenure (1999-2000) as Supervisor, Supply Management Officer, he was seldom asked to attend meetings, which included you and members of the staff he supervised.

Mr. Ridgely was invited to meeting I held with his staff. On several occasions (I do not have the exact dates), Mr. Ridgely called off sick or was late to the office and missed the meetings. Quick response time was needed in day to day operations in order to provide good customer service. Whenever Mr. Ridgely was not available, I discussed work issues with employees at various times during the workday and asked them to perform assignments. I did my best to inform Mr. Ridgely of the issues/assignments as soon as possible after I talked with the employees and asked the employees to brief Mr. Ridgely on the issues or assignments that were discussed. In addition, I sent Mr. Ridgely carbon copies of e-mails I sent to his employees so that he would be aware of the activity within his area of responsibility. A further point I would like to have on record is that upper management of MSHA also occasionally discusses issues or makes requests of the staff without going through the various supervisory levels. It is not practicable to have the supervisor present every time you talk with an employee.

19. Please respond to Mr. Ridgely's allegation that you assigned duties directly to staff he supervised without his knowledge.

Please see my response to question 18. During Mr. Ridgely's tenure as Supervisor, Supply Management Officer, Mr. Ridgely's staff would come to me with questions and requests for guidance whenever Mr. Ridgely was not available or was not able to provide the information, expertise, and instruction needed.

20. Why was Mr. Ridgely denied training for the 1-day seminar "Teaching the Elements of Writing Performance Appraisals in mid-March 2000.

Page _6_ of Page _11_
Initials: _MRP_

Affidavit of _____  *Melissa Stocht* _____

Mr. Ridgely states in his affidavit that I denied his request for training through Mr. Adam Hare, the (then) Acting Chief, Management Services Division". In March of 2000, I was the Chief, Management Services Division. I was not detailed to Acting Chief, Administration and Management until April 2000. I do not recall denying Mr. Ridgely training. I would like to obtain a copy of Exhibit 10.

21. Please respond to the allegations outlined in Mr. Ridgely's affidavit on page 7, referencing a vacancy announcement for a Supply Management Officer, GS-12.

22. Are these allegations true?

23. If so, what role did you play in announcing this "Supply Management Officer" position and in the filing of that position?

Mr. Ridgely states in his affidavit that a vacancy announcement was advertised in January 2002 for a position located at MSHA's National Mine Health and Safety Academy for a Supply Management Officer GS-12. I had no involvement with this vacancy announcement or position. During January 2000, I occupied my position of record as Chief, Management Services Division. The position Mr. Ridgely references was not within the Management Services Division. I was not aware that the position had been advertised and therefore can not confirm or deny that the allegation is true. I am not aware of the duties of this position. I do not have a copy of the position description for this position.

A vacancy (announcement no. MSHA-00-113) was opened on 7/31/00 for a Supply Management Specialist GS-11/12 located within the Management Services Division, Facilities and Property Management Branch at Arlington, Virginia. This vacancy announcement was an error and was cancelled on 8/11/00.

A vacancy (announcement no. MSHA-00-116 R) was opened on 9/25/00 for a Property Management Officer GS-1101-12 located within the Management Services Division, Facilities and Property Management Branch at Arlington, Virginia. I am the second level supervisor to the incumbent of this position.

25. Mr. Ridgely alleges that in 1998, Ms. Joanne Brothers was detailed into his position to permit him higher level duties. Please respond. (See allegations on pages 8 - 9 of Mr. Ridgely's affidavit).

Ms. Dewan accepted a detail to the Department of Labor as a GS-11 and accepted a permanent position as a GS-11. Verification of this can be obtained by contacting Ms. Dewan or the Department of Labor personnel office.

Page _7_ of Page _11_
Initials: _Mео_

Affidavit of _____ Melissa Stocka _____

During the meeting on 3/3/98 from 3:00pm to 3:30pm., attended by Mr. Ridgely, Adam Hare and Don Hinderliter, Mr. Ridgely expressed a concern about having time to perform his regular duties while also performing the higher level work. As a result, Mr. Ridgely was asked and he agreed to pass along forms printing information to George Greenwald and would give me a list of the work he could hand off to another employee, Ms. Joanne Brothers, by 3/20/98. I have no recollection of an official detail for Mr. Ridgely or Ms. Brothers being discussed or approved. Ms. Brothers was not detailed to another position as Mr. Ridgely falsely stated in his affidavit. Mr. Ridgely did not provide me with the list of assignments or work to hand off to Ms. Brothers. Mr. Ridgely had my, Mr. Rose, and Mr. Hinderliter's approval to pass this work on to Ms. Brothers directly, but to the best of my recollection, he did not. I did not receive a copy of Exhibit 14. In order to address the specific information Mr. Ridgely provided, I will need to review a copy of Exhibit 14.

During Mr. Ridgely's tenure as the Supervisory Supply Management Officer, I recall him meeting with me to discuss Ms. Brothers's negative leave balance. I also recall instructing him to discuss this with the Human Resources Division's Employee Relations Office since they would provide him with advice and assistance in this matter. I also told Mr. Ridgely that once he had discussed this matter with an Employee Relations Specialist, we could meet again on this issue. To the best of my recollection, Mr. Ridgely did not ask to meet with me again on this issue. I did not state that "I should be happy to have Ms. Brothers come in at all." Since that time period and on several occasions, subordinate supervisors have come to me with concerns regarding their employee's leave. I have also told them to meet with an Employee Relations Specialist and then after obtaining their advice and assistance, to meet with me again on the issue.

Mr. Ridgely's alleges that Ms. Brothers qualified for a career ladder development programs to a GS-12 within the Directorate of Administration and Management due to my recommendation and assistance. This is not true. During January or February 2000, the Department of Labor announced a Career Enhancement Program. This vacancy announcement was available to individuals who wished to apply. Applicants were evaluated by the Department of Labor and applicants were referred to Department of Labor agencies for interview and selection. I was not a member of the MSHA panel that interviewed the applicants. I did not review the vacancy announcement or assist Ms. Brothers with her application. I did advise Ms. Brothers, Ms. Frankie Sanks, Ms. Patti Stream and all other employees of the Management Services Division that this program was available, seemed to be a good opportunity and recommended that they should consider applying if they were interested.

26. Mr. Ridgely also alleges that you undermined his abilities to efficiently supervise the office when you offered no assistance or support of his supervising Ms. Brothers and her alleged leave abuse.

Page __8__ of Page __11__
Initials: __des__

Affidavit of _____ Melissa Stacha _____

This is not true.

27. Describe Mr. Charles Brinkley's job duties during the tenure of Mr. Ridgely.

During August 1999, Mr. Brinkley was temporarily promoted by Mr. Nichols to a Supply Program Specialist GS 14 while I was detailed from the Chief, Facilities and Property Management Branch position to the Chief, Management Services Division position. To the best of my recollection, he performed the duties of the Chief, Facilities and Property Management Branch Chief.

From 2/13/00 through 7/30/00, Mr. Brinkley performed the duties of a Management and Program Analyst, GS-13; and had responsibility for management of the MSHA-wide security program, performed special assignments for the Facilities and Property Management Branch Chief, conducted studies and analysis of Branch programs, and directed, through a subordinate supervisor, the activities of the Arlington facilities and property management administrative support functions. During this time frame, Mr. Brinkley was detailed to the Office of Assessments Civil Penalty Compliance Office in order to conclude his previous work on action items resulting from an Inspector General audit of that program.

28. Respond to the allegation that Mr. Ridgely had more experience with the Division of Management Services in comparison to Mr. Charles Brinkley (See page 19 of Mr. Ridgely's affidavit).

When Mr. Brinkley was reassigned to the MSD, the position he vacated and assumed were both at the GS-13 level. In addition, the position that Mr. Brinkley assumed (Management and Program Analyst). Management chose to fill this position at the GS-13 level in a non-competitive fashion. If this position had been advertised, Mr. Ridgely would not have qualified because he did not possess at least one year of experience at the GS-12 level.

29. Did you tell Mr. Hinderliter, at any time, that Mr. Ridgely refused to turn over his lower level work?

I would like copies of Exhibits 14, 16, 17, and 19. I did tell Mr. Hinderliter and Mr. Rose that Mr. Ridgely did not complete the higher level work assignments given to him. Mr. Hinderliter and Mr. Rose also experienced this first hand. For additional information, both gentlemen should be contacted.

30. If so, when?

I would like copies of Exhibits 14 and 16.

Page ___7___ of Page __11__
Initials: _____MS_____

F3.21

Affidavit of _____  _____

31 If not, what did you tell Mr. Hinderliter concerning Mr. Ridgely not performing at the next level?

Please see my response to question 29.

32. Please respond to the allegations referenced on page 15 of Mr. Ridgely's affidavit whereby he references an improper procurement action, which he reported to Mr. Hinderliter.

I do not recall this at all. If Mr. Ridgely had brought an improper procurement action to my attention, I would have referred him to the Chief, Acquisition Management Branch who had responsibility for the procurement program. I find it hard to believe that the Chief, Acquisition Management Branch and Mr. Hinderliter would both ignore an improper procurement action. I would like a copy of Exhibit 18.

33. Is true that subsequent to Mr. Hinderliter reiterating existing procurement policy, you informed Mr. Ridgely that all opportunities to perform higher level work was going to be taken from him and that he would no longer have the opportunity for advancement to a GS-13 level; that he would be required to work only in the duties of a Printing Specialist, GS-11; and that he would remain there as long as he worked for you? (See page 15 of Mr. Ridgely's affidavit and respond to these allegations.)

This allegation is not true. In addition, I find it hard to believe that the Acquisition Management Branch Chief, Mr. Adam Hare, the black male's immediate supervisor would recommend promotions for an individual that was truly performing improper procurement actions. Also, to the best of my recollection, I approved 1 promotion for the black male individual. I believe that the other promotions were accomplished by Mr. Hare, Mr. Hinderliter and Mr. Rose.

I would also like to respond to Mr. Ridgely's allegation on Page 23 of his affidavit. Just to set the record straight, I was the Chief, Management Services Division in January/February 2000. As the Chief, MSD, I had no authority over the Human Resources Division. Also, I was detailed to the Deputy Director, A&M position in April 2000. During my tenure as acting Deputy Director, A&M, I did not know that Mr. Ridgely had applied for jobs or what jobs he applied for. I became aware that he had applied for multiple jobs when I ready his affidavit.

I would also like to respond to Mr. Ridgely's allegation on Page 24 of his affidavit. Attachment 3 documents two of the instances I discussed official details for Mr. Ridgely with my supervisor, Mr. Hare. Mr. Hare told me he called Department of Labor offices, but that no details could be found for Mr. Ridgely. I had other discussions with Mr. Hare regarding the possibility of detail assignments for Mr. Ridgely.

Page _10_ of Page _11_
Initials: _MES_

F3.22

Affidavit of _____ *Melissa Stocka* _____

In addition, I came across the e-mail (Attachment 4) while I was searching for documentation in response to Mr. Ridgely's allegations. I find it interesting that Mr. Ridgely told me in August 1998 that it was a pleasure to work for me and applauded my management style, yet based on the allegations made in his affidavit, he is now stating that in August 1998, I treated him unfairly.

Page _4_ of Page _11_
Initials: _MS_

**WITNESS AFFIDAVIT**

I, (name) _Melissa Stocks_

~~am an~~    ~~employee of~~    ~~applicant to~~ ✓ ~~former~~ employee of the U.S. Department of Labor's:

|  |  |
|---|---|
| (Agency) _Previously_ _USDOL / MSHA_ | _Current_ _US Small Business Administration_ |
| (Office) _Asm / MSD_ | _OHCM_ |
| (Division) _Management Services Division_ | — |
| (Branch) _____ | — |

Located in (city and state) _Arlington, VA_    _Washington, DC_

In the capacity of (show both your organization title and the classification of your job, if different):

_Mgmt Svcs Officer / Chief, MSD_    _Special Assistant_

Grade _15_ between (date) _12/99_ and (date) _11/21/04_    GS14   11/21/04 – 3/7/05

My telephone number during working hours is: _____    202-205-6729

**I HAVE BEEN ADVISED OF THE FOLLOWING:**

I am required by Federal regulations and Department of Labor policy to cooperate fully with the investigator who has been assigned to conduct an impartial and appropriate investigation into a complaint of discrimination against the Department of Labor. I must provide a statement for the investigative record that is true and complete to the best of my knowledge and belief and fully discloses all of my firsthand knowledge having a bearing on the merits of the complaint. My statement is made under oath (or affirmation), without a pledge of confidentiality, in accordance with the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Department of Labor. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown this statement and be given an opportunity to respond. In addition, the Complainant and the appropriate Department of Labor officials involved in the EEO complaint process will receive the entire investigative report. I have the right to review my statement prior to signing it and may make initialized corrections if it is incomplete or inaccurate. I have the right to receive a copy of the signed statement.

I am entitled to representation by a person of my choice during my participation in the EEO process (so long as my choice does not result in a conflict of interest). I have ____ have not ✓ chosen a personal representative at this time.

EEO regulations specifically protect participants in the EEO complaint process from any acts of reprisal, discrimination, coercion, harassment, restraint, or interference as a result of their participation in the EEO complaint process.

Having been advised of the above information about my role as a witness in the investigative process, I solemnly ✓ swear or ____ affirm that the statement to follow is true and complete to the best of my knowledge and belief, and fully addresses the issues and concerns raised by the investigator.

Initials: _MS_

**F3.50**

Affidavit of: Melissa Stoehr

1. Please state of the record your full name, former position and grade with the U.S. Department of Labor, race, sex, and age (date of birth).

Melissa Ann Stoehr, Chief, Facilities and Property Management Branch (Supply Management Officer) GS-14 and Chief, Management Services Division (Management Services Officer) GS-15, Acting Deputy Director, Administration and Management, GS-15, white, female, 7/17/54

2. Please briefly describe your former working relationship with Michel Ridgely.

I functioned as Michel Ridgely's first and second level supervisor at different times during his tenure in the Management Services Division.

3. In his affidavit, Mr. Ridgely testified that after he submitted his resignation in late 1998, Mr. Richard Rose "made [him] the offer for the Supervisory, Supply Management Officer position, with the commitment of the eventual GS-12. It was because of this commitment that [Mr. Ridgely] decided to stay with the government." In addition, in a memorandum addressed to Ms. Patricia Silvey in December 1999, Mr. Ridgely maintained that Mr. Rose had "directed [you] to begin the necessary paperwork [to effect his promotion to the GS-12 level] in preparation for submission to HRD at the end of [his] probationary period, which was July 31, 1999." Please respond to these assertions in detail and specifically address whether Mr. Rose instructed you to begin the paperwork to process a promotion for Mr. Ridgely. If he did, please explain in detail why this promotion did not materialize.

Mr. Rose did not direct me to begin the paperwork to promote Mr. Ridgely to a GS-12. Mr. Rose was my immediate supervisor at that time. If Mr. Rose had directed me to promote Mr. Ridgely, I would have done so.

4. In his affidavit, Mr. Ridgely testified that you "through Mr. Nixon [were] able to ultimately force [sic] [him] out of [his] position as Supervisory Supply Management Officer (Operations Officer) and replace [him] with a younger Black male employee (Mr. Charles Brinkley) at two grade levels (GS-13) higher than [himself]." You are asked to respond with specificity to this allegation. Your response should discuss whether Mr. Ridgely was forced out of his position – either in title or through the removal of duties. If so, please describe specifically what occurred and address any and all reasons for such action.

I did not force Mr. Ridgely out of his position as a Supervisory Supply Management Officer, GS-11, either in title or through the removal of his duties. To the best of my

Page 1 of 4
Initials: _mas_

Affidavit of Melissa Stoehr

knowledge, Mr. Nixon did not force Mr. Ridgely out of his position either in title or removal of his duties. Mr. Ridgely's title and duties remained unchanged until the effective date of his reassignment to the Office of Assessments.

5. In a previous affidavit submitted for this investigation, you testified that "Mr. Ridgely was a supervisor from 1/31/99 through 7/30/00. [You] did not remove his supervisory duties or work responsibilities from him. On 7/30/00, Mr. Ridgely was reassigned/converted to a non-supervisory Civil Penalty Compliance Specialist and began reporting to the Office of Assessments. Documentation is available upon request." Indicate who (name all persons involved) made the decision to reassign/convert Mr. Ridgely. Most critically, please address with specificity why Mr. Ridgely was reassigned/converted. You are asked to provide any available documentation to corroborate your response to this question.

I had no involvement in the transfer of Mr. Ridgely from the Facilities and Property Management Branch to the Office of Assessments. I made no decisions regarding Mr. Ridgely's reassignment/conversion/transfer to the Office of Assessments. The Office of Assessment's management did not discuss Mr. Ridgely transfer to their office with me. Mr. Ridgely did not discuss his transfer to Assessments with me. It is my understanding that Mr. Ridgely voluntarily applied, was selected, and accepted a vacant position within the Office of Assessments.

6. Please provide a copy of Mr. Ridgely's position description before and after this reassignment/conversion. Please also provide SF-50s demonstrating the position held before and after reassignment/conversion. (You may wish to seek assistance from Mr. Michael Thompson, MSHA EEO Manager, to provide the requested documentation.)

Mr. Michael Thompson advised me on 3/4/05, to refer you to the Mine Safety and Health Administration's Human Resources Division to obtain the requested documentation.

7. Mr. Ridgely testified that upon learning that "new employees" would soon be reporting to his organization (in early March 2000), he asked you to meet to discuss the respective roles of the new employees. Mr. Ridgely stated that you informed him that "the new employee would be taking over [his] duties as supervisor." Please respond to this assertion with specificity. In your response, discuss with specificity how this new employee, Mr. Charles Brinkley, impacted Mr. Ridgely's work responsibilities/duties.

Page 2 of 4
Initials: _MS_

F3.52

Affidavit of:  Melissa Stoehr

I did not inform Mr. Ridgely that the new employee would be taking over his duties as a supervisor. I did reply to Mr. Ridgely's inquiry. See Mr. Ridgely's Exhibit 6 (copy attached). Mr. Charles Brinkley's transfer to the Facilities and Property Branch had no impact on Mr. Ridgely's work responsibilities or duties other than Mr. Brinkley became Mr. Ridgely's first level supervisor. None of Mr. Ridgely's duties or responsibilities were removed or changed.

8.  Please provide a copy of Mr. Brinkley's position description and SF-50 upon his placement into the position of Management Program Analyst within the Facilities and Property Management Branch in February/March 2000. (You may wish to seek assistance from Mr. Thompson, MSHA EEO Manager, to provide the requested documentation.)

Mr. Michael Thompson advised me on 3/4/05, to refer you to the Mine Safety and Health Administration's Human Resources Division to obtain the requested documentation.

9.  I attach for your review one page of a previous affidavit provided for this investigation. In response to question number 4, you provided information on Charles Brinkley's career path that led to placement in the position of Management Program Analyst. You are asked to review this response and obtain any and all documentation to corroborate your testimony (such as SF-50s, etc.) (You may wish to seek assistance from Mr. Michael Thompson, MSHA EEO Manager, to provide the requested documentation.)

Mr. Michael Thompson advised me on 3/4/05, to refer you to the Mine Safety and Health Administration's Human Resources Division to obtain the requested documentation.

10. Please indicate any and all persons involved, to the best of your knowledge and belief, in the decision to reassign Mr. Brinkley as Management Program Analyst. To the best of your knowledge and belief, please describe why Mr. Brinkley was reassigned. Please also indicate whether Mr. Ridgely's position, performance, etc. influenced the decision to reassign Mr. Brinkley to this position.

Mr. Lynnette Haywood and I approved Mr. Brinkley's reassignment to the Facilities and Property Management Branch as a Management Program Analyst GS-13. At that time, the Facilities and Property Management Branch was in need of a manager for the newly established national security program, to perform studies and analysis of the Arlington, national, and regional programs, e.g., property, vehicle, space management, supply, mail, and telecommunications, evaluate work processes, operating procedures, and productivity, and direct, through a subordinate supervisor, the activities of the Arlington operations staff. My decision to approve the reassignment of Mr. Brinkley to the

Page 3 of 4
Initials:  MS

F3.53

Affidavit of: Melissa Stoehr

Facilities and Property Management Branch was based on the workload of the Branch.

11. In a previous affidavit provided for this investigation, you also explained that "at the time Mr. Brinkley was reassigned (2/2000), a new position has been established at the GS-13 level." Please explain who established this new position and indicate, to the best of your knowledge and belief, why it was established at that time.

A Management Program Analyst (Security Manager), GS-343-13 position was established. See my response to Question 10.

12. Mr. Ridgely has also alleged that you denied his requested training, including a seminar on the elements of writing performance appraisals in March 2000. To the best of your recollection, please explain why Mr. Ridgely was not permitted to attend this training. Please also respond to the broader allegation that Mr. Ridgely was generally denied training. Please submit documentation to corroborate your response.

I do not recall receiving a training request for Mr. Ridgely. I also do not recall denying training requests for Mr. Ridgely in general.

13. If you wish to offer any additional relevant testimony, please feel free to do so.

N/A

Page 4 of 4
Initials: _NO_

## NOTIFICATION OF PERSONNEL ACTION

Standard Form 50
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Brinkley, Charles H | | | 02-13-2000 |

### FIRST ACTION

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 721 | Reassignment |

| 5-C. Code | 5-D. Legal Authority |
|---|---|
| N2M | Reg 335.102 |

| 5-E. Code | 5-F. Legal Authority |
|---|---|

### SECOND ACTION

| 6-A. Code | 6-B. Nature of Action |
|---|---|

| 6-C. Code | 6-D. Legal Authority |
|---|---|

| 6-E. Code | 6-F. Legal Authority |
|---|---|

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| CIVIL PENALTY COMPLIANCE SPECIALIST | MANAGEMENT AND PROGRAM ANALYST |
| PD: 002427             Position: 1337 | PD: 001472             Position: 4787 |

| 8.Pay Plan | 9.Occ. Code | 10.Grade or Lvl | 11.Step or Rate | 12.Total Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. Code | 18.Grade or Lvl | 19.Step or Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 1801 | 13 | 02 | $62,920.00 | PA | GS | 0343 | 13 | 02 | $62,920.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $57,698.00 | $5,222.00 | $62,920.00 | $0 | $57,698.00 | $5,222.00 | $62,920.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| MINE SAFETY AND HEALTH ADMINISTRATION | MINE SAFETY AND HEALTH ADMINISTRATION |
| OFFICE OF THE ASSISTANT SECRETARY | OFC OF DIRECTOR OF ADMIN & MGMT |
| OFFICE OF ASSESSMENTS | DIVISION OF MANAGEMENT SERVICES |
| CIVIL PENALTY COMPLIANCE OFFICE | MSHA,A&M, FACIL.& PROPERTY.MGT.BR. |
| | FACILITIES & PROP MGMT GROUP-ARL |

### EMPLOYEE DATA

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1-None          3-10 Point/Disability          5-10 Point/Other | 1 | 0-None          2-Conditional | | YES          X          NO |
| | 2-5 Point     4-10 Point/Compensable     6-10 Point/Compensable/30% | | 1-Permanent   3-Indefinite | | |

| 27. FEGLI | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| B0 | Waived | 9 | Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K | FERS and FICA | 12-20-1986 | F | Full Time | |

### POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 | 1-Competitive Service  3-SES General | E | E-Exempt | R056Q3AG000001101000 | 0010 |
| | 2-Excepted Service     4-SES Career Reserved | | N-Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station          (City-County-State or Overseas Location) |
|---|---|
| 51-0100-013 | ARLINGTON  Arlington  VA  USA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | PAR Number:  AM-0-030 |

### 45. Remarks

- This position is inside the bargaining unit - Local 12.
- Merit Staffing Exception - Reassignment to position with no greater promotion potential than position currently held.
- Position is at the full performance level.

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| Department of Labor | |
| Mine Safety and Health Administration | |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | James M Cheskawich |
|---|---|---|---|
| DLMS | 4155 | 02-22-2000 | Personnel Officer |

Standard Form 52
Rev 7/91
U.S. Office of Personnel Management
Guide to Processing Personnel Actions, Chapter 4

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office (Also complete Part B, Items 1,7-22,32,33,36 and 39)

| 1. Actions Requested | 2. Request Number |
|---|---|
| Reassignment/Conversion | AM-0-030 |
| 3. For Additional Information Call    (Name and Telephone Number) | 4. Proposed Effective Date |
|  | 02-13-2000 |

| 5. Action Requested By    (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By    (Typed Name, Title, Signature, and Concurrence Date) |
|---|---|
| Johnson,Paulette E    02-22-2000<br>PERSONNEL ASSISTANT(OFFFICE AU |  |

## PART B - For Preparation of SF 50 (Use only codes in The Guide to Personnel Data Standards. Show all dates in month-day-year order.)

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Brinkley,Charles H |  |  | 02-13-2000 |

### FIRST ACTION / SECOND ACTION

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 721 | Reassignment |  |  |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N2M | Reg 335.102 |  |  |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
|  |  |  |  |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| CIVIL PENALTY COMPLIANCE SPECIALIST<br>PD: 002427          Position: 1337 | MANAGEMENT AND PROGRAM ANALYST<br>PD: 001472          Position: 4787 |

| 8.Pay Plan | 9.Occ. Code | 10.Grade or Lvl | 11.Step or Rate | 12.Total Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ. Code | 18.Grade or Lvl | 19.Step or Rate | 20.Total Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 1801 | 13 | 02 | $62,920.00 | PA | GS | 0343 | 13 | 02 | $62,920.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $57,698.00 | $5,222.00 | $62,920.00 | $0 | $57,698.00 | $5,222.00 | $62,920.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| MINE SAFETY AND HEALTH ADMINISTRATION<br>OFFICE OF THE ASSISTANT SECRETARY<br>OFFICE OF ASSESSMENTS<br>CIVIL PENALTY COMPLIANCE OFFICE | MINE SAFETY AND HEALTH ADMINISTRATION<br>OFC OF DIRECTOR OF ADMIN & MGMT<br>DIVISION OF MANAGEMENT SERVICES<br>MSHA,A&M, FACIL.& PROPERTY.MGT.BR.<br>FACILITIES & PROP MGMT GROUP-ARL |

## EMPLOYEE DATA

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 1 | 1-None    3-10 Point/Disability    5-10 Point/Other<br>2-5 Point    4-10 Point/Compensable    6-10 Point/Compensable/30% | 1    0-None    2-Conditional<br>1-Permanent    3-Indefinite | | YES    X    NO |

| 27. FEGLI | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| B0 | Waived | 9    Not Applicable | 0 |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|
| K | FERS and FICA | 12-20-1986 | F | Full Time | |

## POSITION DATA

| 34. Position Occupied | | 35. FLSA Category | | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|
| 1 | 1-Competitive Service    3-SES General<br>2-Excepted Service    4-SES Career Reserved | E | E-Exempt<br>N-Nonexempt | R056Q3AG000001101000 | 0010 |

| 38. Duty Station Code | 39. Duty Station    (City-County-State or Overseas Location) |
|---|---|
| 51-0100-013 | ARLINGTON Arlington VA USA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| 45. Educational Level | 46. Yr. Degree Attained | 47. Academic Discipline | 48. Functional Class<br>00 | 49. Citizenship<br>1    1-USA 8-Other    X | 50. Veterans Status<br>Non Vet | 51. Supervisory Status<br>8    Other |

## PART C - Reviews and Approvals (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | 1. Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. | | | D. | | |
| B. | | | E. | | |
| C. | | | F.<br>Signature | | Approval Date<br>12/2/00 |

2. Approval: I certify that the information entered on this form is accurate and
the proposed action is in compliance with statutory and regulatory requirements.

OVER

Editions Prior to 7/91 Are Not Usable After 6/30/93

CONTINUED ON REVERSE SIDE

Name:  Brinkley,Charles H                                    PAR Number.    M-0-030

## PART D - Remarks by Requesting Office

(Note to Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement?    ☐ YES    ☐ NO
If ""YES"", please state these facts on a separate sheet and attach to SF52).

Reassignment (Other)

## PART E - Employee Resignation/Retirement

### Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 abd 3301 authorize OPM and agencies to issue

regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administation of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations.
   Your resignation/retirement is effective at the end of the day - midnight - unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address    (Number, Street, City, State, ZIP Code) |
|---|---|---|---|
| | | | |

## PART F - Remarks for SF 50

- Merit Staffing Exception.
- This position is inside the bargaining unit - Local 12.
- Merit Staffing Exception - Reassignment to position with no greater promotion potential than position currently held.
- Position is at the full performance level.

Standard Form 52
7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

## PART A - Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36 and 39.)

**1. Actions Requested**
Reassignment    (See notes in Pt B)

**2. Request Number**
AM-0-030

**3. For Additional Information Call (Name and Telephone Number)**
Melissa Stoehr    703-235-8500

**4. Proposed Effective Date**
1/30/2000

**5. Action Requested By (Typed Name, Title, Signature, and Request Date)**
Melissa Stoehr    Melissa Stoehr 1/21/00
Chief, Management Services Division

**6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date)**
Lynnette Haywood    Lynnette Haywood
Acting Director, Administration and Management

## PART B - For Preparation of SF 50 (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)

**1. Name (Last, First, Middle)**
Charles Brinkley

**2. Social Security Number**
[redacted]

**3. Date of Birth**
[redacted]

**4. Effective Date**
02/13/2000

### FIRST ACTION

| | |
|---|---|
| **5-A. Code** 721 | **5-B. Nature of Action** Reassignment (lateral) |
| **5-C. Code** N2M | **5-D. Legal Authority** Reg. 335.102 |
| **5-E. Code** | **5-F. Legal Authority** |

### SECOND ACTION

| | |
|---|---|
| **6-A. Code** | **6-B. Nature of Action** |
| **6-C. Code** | **6-D. Legal Authority** |
| **6-E. Code** | **6-F. Legal Authority** |

**7. FROM: Position Title and Number**
Civil Realty Compliance Apalyst
PD : 002427    Position: 1337

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| GS | 1801 | 13 | 02 | 62920 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| 57698 | 5222 | 62920 | 0 |

**14. Name and Location of Position's Organization**
DOL MSHA
Office of the Asst. Secty.
Office of Assessments
Civil Realty Compliance Office

**15. TO: Position Title and Number**
Management + Program Analyst
(Safety Manager)    PD # VP00034

| 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| GS | 0343 | 13 | 02 | 62920 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| 57698 | 5222 | 62920 | 0 |

**22. Name and Location of Position's Organization**
U.S. Department of Labor
Mine Safety and Health Administration
Directorate of Administration and Management
Division of Management Services
Branch of Facilities and Property Management

## EMPLOYEE DATA

**23. Veterans Preference**
1 – None
2 – 5-Point
3 – 10-Point/Disability
4 – 10-Point/Compensable
5 – 10-Point/Other
6 – 10-Point/Compensable/30%

**24. Tenure**
0 – None
1 – Permanent
2 – Conditional
3 – Indefinite

**25. Agency Use**

**26. Veterans Preference for RIF**
YES    X NO

**27. FEGLI**
B2    WAIVED

**28. Annuitant Indicator**

**29. Pay Rate Determinant**

**30. Retirement Plan**
K

**31. Service Comp. Date (Leave)**
12-20-1986

**32. Work Schedule**
F

**33. Part-Time Hours Per Biweekly Pay Period**

## POSITION DATA

**34. Position Occupied**
1 – Competitive Service
2 – Excepted Service
3 – SES General
4 – SES Career Reserved

**35. FLSA Category**
E – Exempt
N – Nonexempt

**36. Appropriation Code**

**37. Bargaining Unit Status**
0010

**38. Duty Station Code**
51-0100-013

**39. Duty Station (City - County - State or Overseas Location)**
Arlington, Virginia

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Veterans Status | 51. Supervisory Status |
|---|---|---|---|---|---|---|
| | | | | 1 – USA  8 – Other | | |

## PART C - Reviews and Approvals (Not to be used by requesting office.)

| | 1. Office/Function | Initials/Signature | Date | | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|---|---|
| A. | OEO | [signature] | 1/24/00 | D. | Class/Staff | [signature] | 2/4/00 |
| B. | BPD | [signature] | 1/27/0- | E. | | | |
| C. | | | | F. | [signature] | | 2/8/2001 |

**2. Approval:** I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature [signature]    Approval Date 2/8/2001

**CONTINUED ON REVERSE SIDE**

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540-01-333-6239

PART D - Remarks by Requesting Office

(Note to Supervisors: Do you know of additional or conflicting reasons for the employee's resignation/retirement?  ☐ YES  ☐ NO
If "YES", please state these facts on a separate sheet and attach to SF 52.)

2/4 - Per Melissa employee will be detailed
immediately back to Office of Assessments
(w/ Steve Webber) to complete IG report.

2/4/2001

PART E - Employee Resignation/Retirement

## Privacy Act Statement

You are requested to furnish a specific reason for your resignation or retirement and a forwarding address. Your reason may be considered in any future decision regarding your re-employment in the Federal service and may also be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

This information is requested under authority of sections 301, 3301, and 8506 of title 5, U.S. Code. Sections 301 and 3301 authorize OPM and agencies to issue

regulations with regard to employment of individuals in the Federal service and their records, while section 8506 requires agencies to furnish the specific reason for termination of Federal service to the Secretary of Labor or a State agency in connection with administration of unemployment compensation programs.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have; (2) pay or other compensation due you; and (3) any unemployment compensation benefits to which you may be entitled.

1. Reasons for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day – midnight – unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | | 4. Date Signed | 5. Forwarding Address (Number, Street, City, State, ZIP Code) |
|---|---|---|---|---|
| | | | | |

PART F - Remarks for SF 50

Position is at the full performance level.

7LA - Merit Staffing Exception - Reassignment to position
with no greater promotion potential than position
currently held.

7KX - This position is outside the bargaining unit.

# POSITION DESCRIPTION (Please Read Instructions on the Back)

1. Position No. 0034

6. OPM Certification No.

**2. Reason for Submission**
- [ ] Redescription [X] New
- [ ] Reestablishment [ ] Other

Explanation (Show any positions replaced)

**3. Service** [X] Hdqtrs. [ ] Field

**4. Employing Office Location** Arlington, VA

**5. Duty Station** Arlington, VA

**7. Fair Labor Standards Act** [X] Exempt [ ] Nonexempt

**8. Financial Statements Required**
- [ ] Executive Personnel Financial Disclosure
- [ ] Employment and Financial Interests

**9. Subject to IA Action** [ ] Yes [X] No

**13. Competitive Level Code**

**10. Position Status** [X] Competitive [ ] Excepted (Specify in Remarks) [ ] SES (Gen.) [ ] SES (CR)

**11. Position Is:** [ ] Supervisory [ ] Managerial [X] Neither

**12. Sensitivity** [X] 1-Non-Sensitive [ ] 2-Noncritical Sensitive [ ] 3-Critical Sensitive [ ] 4-Special Sensitive

**14. Agency Use**

| | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| **15. Classified/Graded by** | | | | | | |
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | *Management and Program Analyst* | GS | 0343 | 13 | | 2/4/2000 |
| e. Recommended by Supervisor or Initiating Office | Management Program/Analyst | GS | 0343 | 13 | | |

**16. Organizational Title of Position (if different from official title)**
Security Program Manager

**17. Name of Employee (if vacant, specify)**
Charles Brinkley

**18. Department, Agency, or Establishment**
DEPARTMENT OF LABOR

a. First Subdivision
MINE SAFETY AND HEALTH ADMINISTRATION

b. Second Subdivision
DIRECTORATE OF ADMINISTRATION & MANAGEMENT

c. Third Subdivision
DIVISION OF MANAGEMENT SERVICES

d. Fourth Subdivision
BRANCH OF FACILITIES & PROPERTY MANAGEMENT

e. Fifth Subdivision

**Signature of Employee (optional)**

**19. Employee Review—This is an accurate description of the major duties and responsibilities of my position.**

**20. Supervisory Certification.** I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

a. Typed Name and Title of Immediate Supervisor
Melissa Stoehr
Chief, Management Services Division
Signature / Date 1/21/00

b. Typed Name and Title of Higher-Level Supervisor or Manager (optional)
Lynnette Haywood
Acting Director, Administration & Management
Signature / Date 1-24-0

**21. Classification/Job Grading Certification.** I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

Typed Name and Title of Official Taking Action
WILL ELDER
PERSONNEL MANAGEMENT SPECIALIST
Signature / Date 2/4/2000

**22. Position Classification Standards Used in Classifying/Grading Position**
GS-343, Management and Program Analysis Series

**Information for Employees.** The standards, and information on their application, are available in the personnel office or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks** Full performance level is GS-13.

F10.1

Management Program Analyst (Security Manager)
GS-343-13

## A.   Introduction

This position is located in the Branch of Facilities and Property Management.   The incumbent is responsible for the Agency's security management program policy and serves as the Agency's expert advisor on such program areas.   The incumbent is also responsible for oversight and management of the Headquarters operations and services.

## B.   Major Duties

1.   Initiates and develops the security program, policies and procedures for program operations throughout the agency.   Plans, organizes, directs, coordinates, and evaluates the security program.

2.   Speaks as the agency authority on all security matters. Consults on and coordinates the programs with top management officials in the agency, the Department and Federal and local law enforcement representatives.

3.   Resolves serious problems in all matters concerning MSHA security with GSA Federal Protective Service, Federal Marshals and the Department of Labor Security Officer.

4.   Develops security training and guidance material for the agency.   Conducts training at headquarters and at field locations.   Conducts program management reviews providing corrective direction as needed.

5.   Frequently performs special assignments for the Chief, Facilities and Property Management Branch having MSHA-wide application.   Assignments may relate to any Branch administrative function and generally would have MSHA-wide impact.   Assignments are complex in nature.

6.   Incumbent conducts studies and analysis of Branch programs to determine compliance with regulatory requirements and the effectiveness and efficiency of nationwide administrative operations and programs.   Administrative programs include: property, vehicle and space management, supply, mail, and telecommunications.   Evaluates work processes, operating procedures, and productivity and makes recommendations for problem resolution and/or redistribution or workload.   Prepares reports of findings and makes recommendations that address improvement in the achievement of program goals and objectives.

F10.2

7.    Directs through subordinate supervisor the activities of a staff of full time permanent and part-time employees who carry out the Arlington operation work as follows:

> Space Management
> Telecommunications Management
> Mail Management
> Supply Management
> Property Management
> Warehouse Management

8.    Establishes long range, intermediate range and short range plans for the organization. Plans projects or programs to be accomplished by subordinates. Sets priorities and prepares schedules for completion of work. Assigns work to subordinates. Evaluates performance of immediate subordinates and reviews evaluation made by subordinate supervisor. Makes recommendations or decisions for appointment, promotion or reassignment. Hears and resolves minor and/or serious employee complaints, including group grievances. Effects disciplinary action, such as warnings and reprimands.

C.  <u>Factors</u>

1.    <u>Knowledge required by the position</u>:

(a)  Skill in briefing managers both verbally and in writing to communicate complex issues, objectives and processes in order to support recommendations which will improve the efficiency and effectiveness of programs and operations.

(b)  Ability in developing and maintaining effective working relationships with all levels of management within and outside the agency.

(c)  Skill in coordinating, planning and overseeing projects that have a far-reaching effect down to the lowest field office.

(d)  Wide business skills and sound judgement in interpreting and applying laws and regulations to the agency's programs.

(e)  Thorough knowledge of MSHA's program functions and organization.

2.  <u>Supervisory Control</u>:

Performs under the direction of the Chief, Facilities and

**F10.3**

Property Management Branch in Arlington, Virginia who makes assignments in terms of overall objectives.

The supervisor provides administrative direction and makes assignments in terms of defined programs or functions or long-range agency objectives. Requirements frequently stem from mission or program goals and objectives or from national, departmental or agency policy.

The employee determines the approaches and methods necessary to carry out the assignment, including the design of overall plans and strategies for the projects. The employee independently carries out the work, including continual coordination of the various elements involved providing the supervisor with status reports and informs the supervisor of controversial issues, or problems that arise during the project.

Recommendations for new approaches or policies are usually reviewed for compatibility with program and agency objectives.

3.  Guidelines:

Guidelines consist of legislation, broad and general policy statements, and regulations involving one or more agencies, which require extensive interpretation.

Policies and procedures are available but stated in general terms, or are of limited use. Intensive searches of a wide range of regulations and policy circulars applicable to the numerous and diversified issues encountered are frequently required. Guidelines are often inadequate in dealing with problems, requiring ingenuity and originality in interpreting, modifying, and extending guides, techniques, and precedents.

The employee uses experienced judgement and initiative in applying principles underlying guidelines, in deviating from traditional techniques; or in researching trends and patterns to develop new approaches.

4.  Complexity:

The problems encountered by this position are difficult because of the specialized and technical nature of the duties. Resourcefulness and seasoned judgement are required to solve these complex problems since guidelines are broad and only have general applicability.

Eight separate GSA and OASAM Regional Offices are regularly dealt with for provision of services. Over 180 separate organizational

units are serviced nation-wide. Due to constantly changing conditions in the mining industry, legislative changes, development and recommendation of policies and procedures for MSHA-wide application and implementation must be flexible enough to be applied to varied organizational structures, and program objectives, yet sufficient to accomplish the intended results.

Decisions involve responsiveness to continuing changes in programs, technological developments and emergency situations affecting life and property. The employee is constantly balancing program and technical needs, the interests of competitive groups and regulatory requirements, to make decisions based on sound judgment that are in the best interest of the Agency. The significance of the widening range of possible threats (including terrorism) in a new era of proliferating technologies necessitates a viable Agency security infrastructure that insures the safekeeping of employees, facilities, vital records and the continuity of agency business.

5.    Scope and Effect:

Much of the employees work is to resolve problems, or develop new approaches for use by the agency. Recommendations are accepted as authoritative. The work requires long-term commitments, developing innovative arrangements to resolve critical problems and satisfy unusual situations and develop method that resolve administrative problems.

6.    Personal Contacts:

Contacts are generally with other Federal personnel at all levels within MSHA, DOL, GSA and occasionally with contractors.

7.    Purpose of Contacts:

The incumbent meets with MSHA, DOL and GSA personnel at all levels to review and discuss requirements and to resolve problems associated therewith. Incumbent must resolve conflicts and disagreements and endeavor to reconcile conflicting views on agency programs.